In re AMERICAN WAY SERVICE CORPORATION, Debtor.

James S. Feltman, Chapter 11 Trustee of American Way Service Corporation, and Richard M. Langhorne, Chapter 11 Trustee of Thomas A. Warmus, Plaintiffs,

v.

Thomas Aloysius Warmus, Debtor, Thomas Alan Warmus, Gary Dee, Moreno Valley Pontiac Buick GMC Truck, a California Corporation, William Cheek and Touchdown Development Corporation, a Florida corporation, Defendants.

James S. Feltman, Chapter 11 Trustee of American Way Service Corporation, and Richard M. Langhorne, Chapter 11 Trustee of Thomas A. Warmus, Plaintiffs,

v.

Nancy Kay Dailey, Gary Dee, William Cheek, Touchdown Development Corporation, Mae Muir, Kathleen Lowe and David Howard, Defendants.

Bankruptcy No. 94–24696–BKC–RBR.
Adversary Nos. 96–0896–BKC–RBR–A, 96–1329–BKC–RBR–A.

United States Bankruptcy Court,
S.D. Florida,

Jan. 21, 1999.

Herbert Stettin, Miami, Florida, for James S. Feltman and Richard M. Langhorne, liquidating trustees.

Paul J. Battista, Miami, Florida, for James S. Feltman and Richard M. Langhorne, liquidating trustees.

Charles Lichtman, Fort Lauderdale, Florida, for James S. Feltman and Richard M. Langhorne, liquidating trustees.

Randal Leshin, Pompano Beach, Florida, for defendants Nancy K. Dailey, Gary Dee, Thomas Alan Warmus, Mae Muir, and Touchdown Development Corporation.

Thomas Aloysius Warmus, in pro per.[1]

## OPINION REGARDING TRUSTEES' ACTIONS TO RECOVER AVOIDABLE TRANSFERS OR ESTABLISH OWNERSHIP PERTAINING TO THE CARS, THE BOAT, AND THE PLANE

JAMES D. GREGG, Chief Judge.[2]

### I. ISSUES

Although there are many, varied issues connected with these consolidated adversary proceedings, the major points of contention are whether one, or more, of the Defendants received avoidable fraudulent conveyances, under federal or state law, and whether certain personal property assets are property of one of the bankruptcy estates or whether such assets are owned by other non-debtor persons. Some of the ancillary issues include the burden of proof in 11 U.S.C. §§ 548 and 549 avoidance actions, the effect of the substantive consolidation of two separate bankruptcy cases, liability of transferees under 11

---

1. Thomas Aloysius Warmus, although listed as a Defendant in one of the above consolidated adversary proceedings, was dismissed as a party by the court over his objection, on Plaintiffs' motion, shortly after commencement of the trial. Therefore, Thomas Aloysius Warmus only participated as a Defendant during the preliminary portion of the trial. *See* Trial Transcript, Volume III., pages 378–434, hereinafter abbreviated "Tr. III at 378–434."

2. James D. Gregg, Chief Judge, United States Bankruptcy Court for the Western District of Michigan, sitting by designation.

U.S.C. § 550, and the applicability of the separate judgment rule.

## II. JURISDICTION

The court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334 and 157. These adversary proceedings are core proceedings under 28 U.S.C. § 157(b)(2)(E), (F), and (H). This opinion constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

## III. PROCEDURAL HISTORY

Debtor American Way Service Corp. ("AWSC") filed a voluntary petition under chapter 11 of the Bankruptcy Code on December 2, 1994 (Case No. 94–24696). Its principal, Thomas Aloysius Warmus, had individually filed a voluntary chapter 11 petition one day earlier, on December 1, 1994 (Case No. 94–24673). On October 12, 1995, the court approved the appointment of James S. Feltman ("Feltman") as the chapter 11 trustee for the AWSC estate. Similarly, on December 13, 1995, the court approved the appointment of a chapter 11 trustee in the Warmus case. Plaintiff Richard M. Langhorne ("Langhorne") eventually was appointed as the chapter 11 trustee of the Warmus estate, succeeding Kenneth Welt. Langhorne and Feltman (collectively the "Trustees") worked closely in administering the estates, and jointly commenced the above-captioned adversary proceedings.

The Trustees commenced Adversary Proceeding No. 96–0896 (the "first action") against Thomas Aloysious Warmus and his wife, Nancy K. Dailey, on August 8, 1996, initially seeking injunctive relief and turnover of certain items of property, including a yacht, an airplane, and two sports cars. The Trustees, on September 30, 1996, amended their complaint in the first action to remove Nancy K. Dailey as a defendant, to add additional defendants,[3] and to seek additional relief, including declaratory relief and damages regarding additional items of property. The Trustees also sought to avoid specified transfers under 11 U.S.C. §§ 544, 547, 548 and 549.[4] A few months later, on December 2, 1996, the Trustees commenced another action, Adversary Proceeding No. 96–1329 (the "second action"), asserting claims against Nancy K. Dailey, Gary Dee, William Cheek, Touchdown Development Corporation, Mae Muir, Kathleen Lowe, and David Howard. The Trustees characterized the second action as concerning the recovery of the value of the proceeds of the automobiles that were at issue in the prior proceeding.[5] Recognizing the similarity of issues and parties, on March 7, 1997, Judge Raymond B. Ray consolidated these two adversary proceedings for purposes of discovery and trial. *See* Order Granting Motion to Consolidate Adversary Proceedings [C.P. 320 in the first action]; Fed.R.Bankr.P. 7042.

Each of the Defendants except David Howard[6] answered the amended complaints. Some of the Defendants asserted counterclaims, many of which were dismissed before trial. *See infra* at 502–03.

The pretrial proceedings resulted in several changes of the parties to these actions, both plaintiffs and defendants. For example, by order dated March 27, 1997 [C.P. 360 in the first action], the court permitted Promotion Programs, Inc. ("Promotion Programs")[7] to intervene as a

---

3. These additional defendants included Thomas Alan Warmus, Gary Dee, Moreno Valley Pontiac Buick GMC Truck, William Cheek, and Touchdown Development Corporation.

4. The Bankruptcy Code, as amended, is set forth as 11 U.S.C. 101–1330. Unless otherwise noted, all further statutory references are to Title 11 of the United States Code.

5. *See* Amended Adversary Complaint for Money Damages and Other Relief at ¶ 16 [Court Paper ("C.P.") 4 in the second action].

6. On July 15, 1997, the clerk of court entered Howard's default. *See* Fed.R.Bankr.P. 7055; Fed.R.Civ.P. 55(a).

7. Promotion Programs is a wholly-owned subsidiary of AWSC. Eventually, Trustee Feltman caused Promotion Programs to file a voluntary petition under chapter 11, and thereafter, by orders dated July 17, 1997, Judge Ray substantively consolidated the AWSC and Promotion Program bankruptcy estates. For a discussion of the effect of the substantive consolidation order, *see infra* at Part V.B.

plaintiff after the Trustees learned that Promotion Programs may have owned some or all of the property at issue in these proceedings. In addition, the Trustees, who had initially appeared in their capacities as chapter 11 trustees of the respective estates, were substituted in this action in their new capacities as "liquidating trustees" under the respective chapter 11 plans that Judge Ray confirmed in July, 1997.[8] Indeed, even after the trial of this matter, Judge Ray removed Trustee Langhorne as the liquidating trustee of the Warmus estate, and Kenneth A. Welt was substituted in his place. Because the Trustees serve in a representative capacity, these various changes in their capacity or identity are immaterial to the present litigation. Indeed, successor trustees are automatically substituted in any pending action involving the estate. See FED.R.BANKR.P. 2012(b).

As for changes in the parties-defendant, Judge Ray dismissed the Trustees' claims against William Cheek for failure to state a claim. See Order on William Cheek's Motion for Summary Judgment at 2. Judge Ray also dismissed Moreno Valley Pontiac Buick GMC Truck, on the Trustees' motion, under FED. R.BANKR.P. 7021. See Order Denying Motion of Moreno Valley Pontiac–Buick–GMC– Truck for Summary Judgment at 1–2. Also, on the Trustees' motion, Judge Ray dismissed Kathleen Lowe, finding that she was a "mere stakeholder" with respect to the funds that the Trustees sought to recover from her. See Order Approving Stipulation

of Settlement as to Defendant, Kathleen Lowe. Pursuant to a court-approved agreement, Kathleen Lowe deposited $60,400.00, plus interest, into an escrow account pending further order of the court, essentially as in an interpleader action. See FED.R.BANKR.P. 7022; FED.R.CIV.P. 22(1). Finally, at trial, again on the Trustees' motion, the court dismissed the claims against Thomas Aloysius Warmus, over his objection, after he disclaimed any interest in the property that is the subject of these proceedings. Therefore, the following persons remain as defendants in these actions: Nancy K. Dailey, Thomas Alan Warmus, Mae Muir (now known as Mae Vanderplate), Gary Dee, David Howard, and Touchdown Development Corporation.

Just before the commencement of the trial, the Trustees moved for an order compelling Defendants to file a single answer, with counterclaims, and the Defendants complied. See Consolidated Answer, Affirmative Defenses, and Counterclaim filed November 7, 1997 ("Consolidated Answer"); see also Order Granting Motion to Compel Defendants to File a Single Pleading Containing All Defenses and Remaining Counterclaims, dated December 3, 1997 [C.P. 651]. Although their Consolidated Answer asserts nine counterclaims, Judge Ray had previously rejected five of them before trial. See Order Granting in Part Plaintiffs' Motions to Dismiss Counterclaims, dated August 6, 1997 (rejecting counterclaims for set-off, breach of fidu-

**8.** On July 16, 1997, in the Warmus bankruptcy case, Judge Ray confirmed the Second Amended Joint Plan of Liquidation, as modified and proposed by Trustee Langhorne and the Official Committee of Unsecured Creditors. See Memorandum Order and Opinion Confirming Second Amended Plan of Liquidation, as Modified, Proposed by Richard N. Langhorne, as Trustee, and The Official Committee of Unsecured Creditors; and Approving Michigan Settlement, at ¶3 ("Warmus Confirmation Order"). In addition to confirming the Joint Plan in the Warmus bankruptcy, Judge Ray appointed Trustee Langhorne as the "Liquidating Trustee" and substituted him in these adversary proceedings, in his new capacity, as the "real party in interest." See Warmus Confirmation Order at ¶6(b) & (c). Similarly, in the AWSC case, also in July, 1997, Judge Ray confirmed a Second Amended Joint Plan of Liquidation. See Memorandum Order and Opinion (I) Confirming Second Amended Joint Plan

of Liquidation Proposed by the Chapter 11 Trustee, The Official Committee of Unsecured Creditors and the Dealers' Committee, as Modified by a First Modification Thereto and (II) Granting Motion to Approve Settlement and Compromise, at ¶5 ("AWSC Confirmation Order"). Judge Ray likewise appointed James S. Feltman as the "Liquidating Trustee" of the American Way Service Corporation Liquidating Trust. See AWSC Confirmation Order at ¶6. Trustee Feltman is now appearing in this litigation in that capacity. See Notice of Substitution of James S. Feltman, Liquidating Trustee for the American Way Service Corporation Liquidating Trust, as Plaintiff [C.P. 526]; cf. FED R.CIV P. 25(c). The Trustees have agreed, with the court's prior approval, to share equally any recovery in these consolidated adversary proceedings. See Order Approving Trustees' Joint Motion for Approval of Settlement Agreement Between Estates.

ciary duty, abuse of process, unjust enrichment and conversion) [C.P. 512 in the first action].[9]  Only the following counterclaims remained pending at the commencement of the trial: Gary Dee's counterclaims for recoupment or set-off based upon so-called "experience rated refunds" (Counts IV & V of Consolidated Answer); the counterclaims of Gary Dee, Nancy K. Dailey, and Mae Muir for indemnification under the Articles of Incorporation of AWSC (Count VI of Consolidated Answer); and the counterclaims of Thomas Alan Warmus, Gary Dee, and Touchdown Development Corporation for civil theft, restitution, and replevin of specified personalty (Counts VII–IX of Consolidated Answer).[10]

During the pendency of these consolidated adversary proceedings, a number of significant changes took place in the underlying base bankruptcy cases.  Specifically, the court takes judicial notice of the fact that the estates of Promotion Programs and AWSC were substantively consolidated by orders dated July 17, 1997.  *See* Order Granting Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors to Substantively Consolidate American Way Service Corporation Estate with Estate of Promotion Programs, Inc. ("Consolidation Order"); FED.R.EVID. 201.

Following extensive pretrial proceedings, these consolidated adversary proceedings were assigned to the undersigned visiting judge for trial.  The issues were tried to the court, without a jury, on November 18–20, 1997, March 5–6 & 10–12, 1998, and April 28, 1998. After trial, the parties submitted memoranda and reply memoranda, setting forth their legal authorities and closing arguments.

## IV. FINDINGS OF FACT

A.  *The Witnesses and Their Credibility.*

1.  *Warmus.*

Thomas Aloysius Warmus ("Warmus"), is one of the Debtors.  This entire litigation involves Warmus and revolves around the transfers he made, or his activities relating to the personal property subject of the Plaintiffs–Trustees' claims.  Without question, Warmus, a self-made man, is a very intelligent person.  He is both proud and vain; he is capable of being charming and interesting.  He controlled the activities, and the court believes strongly influenced the testimony, of all the various Defendants.

Warmus did not tell the whole truth.  Indeed, the court finds he was truthful only in those instances when honesty would result in his economic benefit.  On direct examination he was forceful in telling his side of the story to justify the transfers and his view of who owned what.  When examined by attorneys for the Plaintiffs, however, Warmus was alternatively evasive, argumentative, sarcastic and hypertechnical.  He seldom answered any adverse question directly unless requested to do so by the court.[11]

The court gives little weight to much of Warmus' testimony for three main reasons. First, his answers at trial were contradictory and varied from his prior deposition testimony.  Second, when looking at all facts in their entirety, Warmus' version often does not logically make sense.  Third, and most important, the overwhelming number of documents admitted into evidence substantially undercut, or are diametrically opposed to, Warmus' testimony.[12]

The court is of the firm conviction that Warmus orchestrated the transfers in ques-

---

9.  The reasons that Judge Ray gave for dismissing the counterclaims in the first action apply with equal force to the analogous counterclaims advanced in the second action.  Moreover, because the cases had already been consolidated at the time Judge Ray decided the motion to dismiss the counterclaims, his order applies equally to both adversary proceedings.

10.  A review of the docket in the first action reveals that the Trustees also moved to dismiss Count I of the counterclaims, [C.P. 589 in Adv.

No. 96–0896], but the docket does not reveal whether Judge Ray formally ruled on the motion.

11.  Throughout the trial, Warmus was very courteous to the court.

12.  When asked to explain differences between documents and his testimony, Warmus had two basic responses—either the documents were erroneous or there existed other documents, not presented at trial, that would support his version of the contested facts.

tion to economically benefit himself to the detriment of his creditors. He used the Defendants as tools to accomplish his ends. After he was "caught," he developed a story to attempt to legitimize his activities. The court believes he basically "wrote a script" for the Defendants to follow in their testimony.[13]

### 2. *Dailey*.

Defendant Nancy Kay Dailey is Warmus' wife ("Dailey"). During the Plaintiffs' portion of the case, Dailey's testimony was given by a prior deposition and the court was not able to observe her demeanor.[14] FED.R.CIV.P. 32(a)(2). Based upon reading her deposition, Dailey was not direct in her answers and was sometimes nonresponsive to pertinent questions.

During the Defendants' presentation of their proofs, Dailey personally appeared and testified. The court notes that at trial she sometimes answered questions pertaining to facts that she could not remember when her deposition was taken. During her direct testimony she gave seemingly rehearsed answers, but was often argumentative and evasive during cross-examination. Dailey was prone toward histrionics including, on more than one occasion, crying.

This court believes she only remembered what she wanted to remember: if a fact might be detrimental to Warmus' and her interests, she conveniently could not remember or was sometimes not forthright. On some occasions she seemed to look toward Warmus during her testimony for guidance. Her testimony, when considered in its totality, basically is she did what she was told by Warmus, or that she could not recall (or did not know) why things were done.[15]

### 3. *Dee*.

Defendant Gary Dee is a friend of Warmus and Dailey ("Dee").[16] In 1988, Dee entered into a business transaction whereby he personally borrowed $275,000, pursuant to two notes in the amounts of $175,000 and $100,000, from Warmus or AWSC. In 1993, the transaction was restructured by Dee paying $50,000, thereby reducing the aggregate obligation to $225,000 with all interest being waived or forgiven. In August 1994, when Warmus transferred eight vehicles to Dee, Dee still owed money to Warmus. Dee was economically beholden to Warmus. Dee stated he entered into the transaction and accepted transfer of the eight vehicles that are at issue in this litigation because "I owed [Warmus] a favor and I trusted him I would get my money back." Tr. VIII at 1950. Later he stated: "I felt I was doing a friend for a—a friend a favor and whatever way that he thought was the best and easiest way to get the job done that he wanted done, I trusted him, so it's fine." *Id.* at 1951. At trial, Dee's testimony appeared structured in such a fashion as to do as little damage to Warmus as possible.

During Plaintiffs' portion of the case, because he was unavailable, Dee testified by his prior deposition and the court was unable to observe his demeanor. Dee seemed to testify truthfully and basically admitted his actions were undertaken solely at the request of Warmus.

At trial, Dee appeared and personally testified during the Defendants' presentation of evidence. His trial testimony was generally consistent with his deposition testimony. Dee was not overly evasive or argumentative either on direct or cross-examination. The court finds Dee's overall testimony is credible, especially that which is supported by the exhibits admitted into evidence.

### 4. *Cheek*.

In 1987 or 1988, William Cheek ("Cheek") began working for Warmus, doing odd jobs at the Warmus residence in Michigan. War-

---

**13.** Of course, the Defendants do not admit they were told by Warmus what to say.

**14.** One of the Trustees' attorneys stated he had unsuccessfully attempted to serve her with process for three weeks. Tr. IV–B at 705.

**15.** Warmus testified that Dailey and he "discussed all things together". Tr. V–A at 1021. It is therefore difficult to understand Dailey's vague recollection of material facts.

**16.** He first met Dailey and Warmus in 1986. In 1988, they attended a Rose Bowl game together.

mus and Dailey consider Cheek as a friend.[17] Cheek formed, and is the president of, Defendant Touchdown Development Corporation ("Touchdown").

During his questioning at trial, Cheek seemed to be an earnest, polite and articulate young man.[18] Although he graduated from college in 1989, Cheek has not had any continued regular employment up to the time he again began working for Warmus in 1994.[19]

Cheek's credibility is mixed. His testimony regarding his involvement in the selling, or attempts to sell, the vehicles rings true in most instances. Although he did much of the paperwork for the auction sale, and detailed the vehicles for sale, Cheek acknowledges that Warmus made final decisions as to whether vehicles would be sold. Regarding the vehicles, Cheek acted as Warmus' instrumentality.

However, the court disbelieves Cheek's testimony regarding the formation of Touchdown which "marketed" certain vehicles and "bought" the boat. Cheek was Warmus' lackey, especially regarding Touchdown's activities. Because of Cheek's economic interest in pleasing Warmus, and Cheek's prior receipt, and anticipated reward, of Warmus' largess, Cheek and his corporation's activities were dictated to, and controlled by, Warmus. Cheek's attempt to carefully craft his testimony to the contrary does not belie this finding.

**17.** Dailey testified that Cheek is a family friend who has "been around since he's been in high school" and a "frequent house guest". Tr. VIII at 1838.

**18.** This is in sharp contrast to his deposition testimony when he seemed to be a very difficult, obstinate and obstreperous witness. Exh. 11. However it does not appear Cheek was rude, although his attorney was. *See, e.g.,* Exh. 11, pp. 69–70.

**19.** Cheek testified he was "doing various other things at the time, doing some computer consulting work." Tr. VII at 1594. He also described himself as "an entrepreneur". *See e.g.,* Exh. 11, pp. 9 and 21.

**20.** Although the attorneys sometimes referred to this Defendant as "Junior", the court adopts the moniker used by Dailey in her testimony to refer

### 5. *Tommy.*

Defendant Thomas Alan Warmus is Warmus' son ("Tommy") and Dailey's step-son.[20] Tommy did not personally testify at trial. Because his deposition was utilized, the court was unable to assess his demeanor. Tommy's testimony was an amalgamation of "I don't know", "I do not recall", "I have no idea", "I have never seen", and "I don't know who has knowledge." The court finds Tommy's testimony is entitled to no weight whatsoever.[21] Tommy's speculated "facts" are not adequately supported by documentary evidence admitted at trial.

### 6. *Muir.*

Defendant Mae Muir, now known as Mae Vanderplate ("Muir"), is Dailey's mother. She did not personally testify at trial: her deposition testimony was utilized by the parties. After Muir's husband died approximately twenty years ago, she worked for Warmus and Dailey, or their corporations, in various capacities, including running errands in Florida.

Muir remembers almost nothing about any fact at issue in this litigation. She does not know why she received a check from Dailey in the amount of $66,400.[22] Muir was a tool of Dailey, in concert with Warmus, to hide proceeds in a bank account. The court is not certain about Muir's credibility and gives her testimony very little weight.

to her stepson. This name reference also seems appropriate because Tommy was between 15 and 17 years old when he allegedly was given ownership of two of the cars and the plane.

**21.** This is not to cast any aspersion on Tommy's honesty. The court believes, given his age and his father's control over the property in question, he truly does not know. To the extent Tommy guessed as to the facts to put them in the best light for his father and step-mother, this is understandable but not excusable.

**22.** The court notes that most persons would remember such a large check. In her testimony, Dailey explains Muir's lack of memory because Muir was taking Valium. Tr. IX at 2108.

### 7. *Howard.*

Defendant David Howard was the controller of the "American Way group of companies" ("Howard").[23] Howard managed all accounting operations and was actively involved in attempting to negotiate a resolution of some of the companies' substantial tax dispute with the Internal Revenue Service.

Howard's testimony was by deposition. Based upon the reading of the entire transcript, the court finds Howard's overall testimony to be credible, most particularly in those instances when documents admitted into evidence corroborate his recollection of the relevant facts.

### 8. *Lowe.*

Gary Lowe ("Lowe") is the owner and controlling person of Winner's Dodge.[24] Although Lowe was not personally present in court, his deposition testimony appears credible. Lowe's sworn statements are supported by documents admitted into evidence. In those instances when Lowe's testimony conflicts with Warmus' testimony, the court believes Lowe.

### 9. *Gans.*

Ted Gans is a Michigan attorney and a social friend of Warmus ("Gans"). He represented American Way Service Corporation (and its affiliates that filed the consolidated tax returns) in Warmus' dispute with the Internal Revenue Service.

Gans testified by his deposition rather than personally appearing at trial. The court finds Gans' testimony to be credible although he has little concrete knowledge regarding the relevant facts contested by the parties.

### 10. *Cipparone.*

Anthony Cipparone ("Cipparone") is an employee of the Internal Revenue Service with his office located in Pontiac, Michigan. His responsibilities, for more than twenty-two years, include collecting taxes. In 1993 or early 1994, Cipparone became responsible for collecting unpaid taxes owed by American Way Service Corporation, and its subsidiaries including Promotion Programs.

Cipparone did not personally testify; rather, his deposition, taken February 2, 1998, was utilized at trial. The court finds Cipparone's testimony to be credible and supported by documents admitted into evidence.

### 11. *Morganroth.*

Mayer Morganroth is a Michigan and New York attorney ("Morganroth") who began representing Warmus some time in 1993. Morganroth's involvement in this litigation and his knowledge of facts is minimal. He briefly testified by a portion of his deposition taken on May 8, 1997. The court finds his testimony to be credible.

### 12. *Feltman.*

Plaintiff James S. Feltman is the Liquidating Trustee ("Feltman") of the American Way Service Corporation.[25] Feltman has no direct personal knowledge regarding most of the facts and transactions which gave rise to this litigation. His testimony was primarily focused upon his duties as a trustee, admissions made to him by Defendants, and, docu-

---

**23.** American Way Service Corporation, the holding company, is one of the debtors; other affiliated companies are: Promotion Programs, Inc.; American Trend Life Insurance Company; Nanceekay Life Insurance Company; American Way Casualty Company of Maryland; American Way Service Corporation Southeast; American Financial Security Life Insurance Company; American Way Holdings, Inc.; and American Way Financial Services. Tr. IV–A at 586–88. Warmus, in concert with Dailey, actually dominated these corporations' activities.

**24.** Lowe is *not* a defendant in these consolidated adversary proceedings. His wife, Kathleen Lowe, is a defendant because she received money

that Dailey received from the sale of two of the cars.

**25.** At trial, the Plaintiffs sought to qualify Feltman as an expert to give opinion testimony under Fed.R.Evid. 702. Although the court believes that Feltman is qualified as an expert to give an opinion about the alleged insolvency of the corporate debtors, the court did not permit him to give expert opinion testimony because of inadequate disclosure to the Defendants which contravened the Honorable Raymond Ray's pretrial order. Feltman's testimony is therefore limited to factual matters and lay opinion testimony under Fed R.Evid. 701. Tr. I at 166–75.

ments within his custody and control. The court finds he testified truthfully and his testimony is corroborated by documents admitted into evidence.

### 13. *The Documents.*

The documents admitted into evidence, by far, are the most important and credible "witness" in these consolidated adversary proceedings. Except as stated to the contrary, all of the documents were prepared at or near the time of the occurrences of the facts discussed herein. The documents are not subject to change or failure of memory due to passage of time. Although some of the documents facially may appear to conflict with each other at times, they are subject to relatively straightforward reconciliation, given all other credible testimony and the overall factual circumstances. To the contrary, much of the Defendants' witnesses' testimony appears feckless and fictive and is also incredible because it is not adequately supported by any documents.[26]

### 14. *Kathleen.*

Kathleen Lowe was previously a defendant in one of these consolidated adversary proceedings, ("Kathleen").[27] She did not testify as a witness, either personally or by her deposition. However, in this litigation, she is bound by an Order Approving Stipulation of Settlement as to Defendant Kathleen Lowe signed by Judge Ray on August 29, 1997. Pursuant to that order, Kathleen was determined to be a "mere stakeholder" and Kathleen has paid $60,400, plus a specified amount of interest, to be held in escrow subject to a determination, in these consolidated adversary proceedings, regarding who is entitled to the funds.[28] Kathleen has

therefore been dismissed, with prejudice, as a defendant in this litigation.

### B. *General Background Facts.*

Warmus first became involved in the insurance business as a life insurance agent in July 1958. On May 15, 1963, Warmus formed the American Way Service Corporation ("AWSC"), an insurance agency. Later, AWSC became a holding company for other corporations in the business of selling vehicle service contract insurance, accident and disability insurance for purchasers of automobiles, and credit life insurance. Promotion Programs, one of AWSC's subsidiaries, was created to motivate dealerships and their sales staff to sell AWSC insurance coverages. Between 1963 and 1988, Warmus formed other companies and the business of AWSC, and its affiliated companies, increased.[29] Most of the companies were operated from the same business location in Southfield, Michigan, where one set of employees performed necessary services for all those corporations, including AWSC and Promotion Programs.

In 1967 or 1968, Warmus met Dailey. Dailey eventually became an account executive and the vice president of sales. The AWSC companies prospered and Warmus and Dailey enjoyed a very comfortable lifestyle. Their personal assets and the assets of the AWSC companies included a condominium at the Shanty Creek Resort in northern Michigan; a cottage on Lake Bellaire, also located in northern Michigan; a home in Franklin, Michigan; a home in Lighthouse Point, Florida; real property in Manalapan, Florida; a 1989 Malibu Piper aircraft; a Maule M–7 235 airplane and a hanger; a Wellcraft Portofino boat; and over fifty automobiles, at least thirteen of which were considered to be collection cars. A large number of assets, in-

---

**26.** *See, e.g., In re Taylored Prods. Inc.,* 5 U.C.C.Rep.Serv. 286, 293, 1968 WL 9184 (Bankr.W.D.Mich.1968) (Nims, Ref.) ("The frailty of the human memory is well known and I would agree with those many judges who would more likely accept a written memorandum on a scrap of paper made at the time of a transaction than thousands of words of testimony adduced two years later.").

**27.** She was a defendant in the second action.

**28.** The order has been admitted into evidence as Exhibit 50. During the trial, Feltman testified he was holding $71,000 until the court determined who was entitled to the funds. Tr. II at 253.

**29.** For example, in March 1978, PR/PS Agency, Inc. ("PR/PS") was created. The purpose of this corporation seems to have been to funnel money to Warmus' children. Warmus treated all the corporations basically as one and commingled assets as he wanted. Tr. II at 373.

cluding the collection cars, were purchased by Promotion Programs as investments. Tr. VI at 1154–55.[30]

Significant problems began on November 8, 1988, when the insurance commissioner for the State of Michigan began proceedings against some of the operating subsidiaries of AWSC. Later, insurance commissioners in other states also began proceedings against certain subsidiaries, and therefore the parent corporation, AWSC, was eventually unable to operate. Warmus stated that the AWSC companies were worth approximately $115 million and his personal net worth was approximately $50 million in November 1988.

In early October 1993, AWSC demanded that Dee pay his outstanding promissory notes in the amounts of $175,000 and $100,-000.[31] Dee responded that he would go bankrupt if he were forced to repay the money. Tr. VIII at 1970. He made a counteroffer of $50,000 provided the remaining obligation of $225,000 would be restructured, with one note to be paid in monthly payments and the other note fully due in five years, on April 1, 1999. Exh. 16C. Promissory notes were sent to Dee to be signed in the amounts of $125,000 and $100,000. The $125,000 note that required a balloon payment was signed by Dee. The $100,000 term note appears not to have been signed. Exh. 16D.

By early 1994, AWSC and Warmus were suffering acute, financial difficulties. Wynn Oil Corporation had obtained a judgment dated February 10, 1994, in excess of $2 million against AWSC and Warmus for trademark infringement. Tr. I at 214–18; Exhs. 38B and 38C. By the summer of 1994, an Internal Revenue Service tax lien in excess of $7 million was also being enforced. IRS Agent Cipparone was beginning to search out assets to seize and sell.

In the summer of 1994, the amount of the IRS tax lien on AWSC's assets, and its subsidiaries' assets (including Promotion Programs), was approximately $7,500,000. Tr. VI at 1339. Cipparone, on behalf of the IRS, had become active in an attempt to collect the unpaid taxes. Warmus, Gans and Howard told Cipparone that the State of Michigan had taken control of most of the corporations that had filed the consolidated tax returns and that were obligated to pay the taxes. Warmus, through Gans and Howard, attempted to negotiate with Cipparone to achieve an offer in compromise regarding the outstanding tax obligation. To attempt to collect the taxes, Cipparone focused upon Promotion Programs because it held what he considered as the "hard assets of the company". Tr. IV–B at 731–33.

To negotiate with the IRS, Howard prepared a schedule of assets owned by Promotion Programs. Exh. 21A. This document was used by Attorney Gans in negotiations with Cipparone. The tentative proposal made by Warmus' negotiating team was that certain assets would be sold and sixty-five percent of the estimated market value from the sale proceeds would be given to the IRS. Apparently, Cipparone was willing to consider such a proposal because the Shanty Creek condominium was in the Traverse City, Michigan, area; the boat was in Florida; the vehicles were in various places; and Cipparone was unable to physically examine the assets of Promotion Programs. Tr. IV–B at 740. In discussions with Cipparone, Warmus proposed to sell the Shanty Creek condominium and turn over the net proceeds to the IRS to be applied to the tax debt. During mid-August 1994, when the condominium was to be sold, Cippar-

---

30. Promotion Programs appears to have been Warmus' "slush fund" to buy anything he wanted. Promotion Programs basically had contingent liabilities and available "reserves" to use. The concept of any "fiduciary duty" pertaining to this company seems totally lacking on Warmus' part. Tr. VI at 1354–55.

31. Warmus loaned money to a number of dealerships, or their principals, because if there was an outstanding loan, Warmus believed the dealer-

ships would continue to sell credit life insurance provided by one of the AWSC companies. Tr. VI at 1334–35. Warmus' loan to Dee apparently arose because Mike Howell allegedly owed Dee approximately $328,000 resulting from dissolution of an auto dealership in Michigan. Although Dee testified about the Howell relationship and indebtedness, the court finds those facts to be marginally relevant at best. See, e.g., Tr. VIII at 1961–63.

one "blew up" because he discovered there was an undisclosed mortgage on the property.[32]

Prior to the "blow-up" over the undisclosed mortgage on the Shanty Creek property, Warmus had anticipated that he would be able to control the sale of the collection cars at the Kruse auction sale in Auburn, Indiana, that would take place in early September.[33] Warmus began thinking about selling the cars at auction as early as May, 1994. However, the final decision to sell the vehicles at the Kruse auction was made by Warmus by mid-July or early August, 1994. By this time, Warmus hired Cheek to detail the vehicles and get them ready for sale. Tr. VII at 1597.

After Cipparone discovered the undisclosed mortgage on the Shanty Creek property, he apparently balked at any of his prior discussions with Warmus regarding selling the cars at the auction and paying the IRS sixty-five percent of the market value. Cipparone then asked for an independent appraisal of the assets. Tr. IV–B at 745. Warmus, having already made tentative arrangements for the possible sale of the collection cars,[34] faced a major problem. How could he obtain the consent of Cipparone to release the IRS lien on the collection cars. A new plan was required.

Warmus called upon Dee because he recently did Dee a "favor" and a favor was owed in return. Tr. I at 62; Tr. IV–B at 813; Tr. VI at 1363.[35] Warmus asked Dee to help him in a transaction to "buy" the collection cars. Tr. I at 64; Tr. VII at 950–51 and 1976. Although Dee previously had seen some of the vehicles in Warmus' garage in 1988, after then he never again saw the vehicles. He was not able (or competent) to value the vehicles. He therefore agreed on a $86,000 net purchase price not as a result of any arms-length negotiations but because Warmus dictated the price. Tr. VIII at 1984–85.[36] Dee really knew nothing about the condition of the vehicles, e.g., whether they were running or not, and totally relied upon Warmus' statements and information that was given to him. *Id.* at 1985–86. Dee decided to go forward with the deal, as structured by Warmus, because he wanted to do a favor for Warmus and because he would not be at risk and would get his money back. *Id.* at 2001–02.[37] Dee therefore complied with Warmus' instructions and prepared a letter on his dealership's stationery, to be used by Warmus in his discussions with Cipparone, whereby Dee proposed to buy eight specified collection cars. *See* Exh. 10 and 16(10), which are duplicate exhibits except for the penned notations on Exh. 16(10). To War-

---

**32.** See Tr. VI at 1351. Apparently, Cipparone thought that he would be receiving $146,250 which was sixty-five percent of the estimated market value. Exh. 21A. The IRS received only $100,000 from the condominium sale proceeds. Tr. IV–B at 764. Cipparone was upset because he discovered that Warmus had failed to disclose that he granted Rocky Mountain Nissan a mortgage on the property.

**33.** The "collection cars", as listed on the Promotion Programs schedule, Exh. 21A, were: a 1969 Detomaso (Mangusta); a 1978 Lamborghini (Countach "S"); a 1978 Ferrari 308; a 1979 Porsche Turbo; a 1979 Ferrari Boxer (BB512); a 1926 Ford Speedster; a 1935 Pickup (Ford); and a 1978 Auburn Boat Tail Speedster. *See also* Exh. 10B. On that schedule, the book value was $377,342; the estimated market value was $270,000; and sixty-five percent of the estimated market value was stated to be $175,500.

**34.** The decision to sell the cars at the Kruse auction had previously been made. Tr. VII at 1409. Kruse had received a deposit to reserve space to sell the cars. Tr. VII at 1654.

**35.** Dee agreed he owed Warmus a favor. Tr. XIII at 1976.

**36.** Warmus agrees that he established the price and acknowledges that it was a "fire sale price." Tr. IV–B at 841.

**37.** Although Dee testified he had enough money to pay for the vehicles, an important aspect of the whole transaction was that American Way Financial Services Corporation, a corporation owned by Dailey of which Warmus was the president, would lend Dee $70,000 of the purchase price. Warmus and Dailey would guarantee that there would be no risk to Dee on the loan. Tr. IV–B at 883. Indeed, Dee did not pay the $86,000 net purchase price until after the sale of some of the cars took place and he had already received some of the proceeds. Also, no collection of the $70,000 loan has yet occurred. Tr. VIII at 1995 and 2000. Warmus thus attempted to keep his promise that Dee would not incur financial risk.

mus, it was important that the "appraisal" be on Dee's Moreno Valley dealership stationery so he could present it to Cipparone. However, the Dee agreement contemplated that Warmus would keep the collection cars, Warmus would market the cars and, after Warmus sold the cars, he would settle up with Dee on Warmus' "commission" and so forth. Tr. VI at 1364–65.[38]

After Warmus cast the deal with Dee, Howard sent Dee a letter, dated August 24, 1994, Exh. 16(11), which enclosed a check payable to Dee, drawn on the American Way Financial Services Corporation checking account in Florida, in the amount of $70,000. Exh. 16(7).[39] On August 25, 1994, at 1:31 p.m., Dee faxed the letter containing the tentative sale agreement to Warmus. In the letter, Dee (per Warmus' instructions) offered to pay a gross price of $116,000 for eight vehicles. The vehicles were: a 1978 Ferrari 512, a 1978 Lamborghini, a 1969 Detomaso, a 1979 Porsche, a 1926 Ford Model T, all of which were listed as "nonrunning, druveable [sic]", a 1978 Ferrari 308, a 1978 Replica Boat Tail, a 1935 Ford Truck, all of which were stated to be "properly running vehicles". Exh. 10 or 160(10).[40] After making deductions for delivery/shipping (presumably to Moreno Valley, California), and a "reserve for nonrunning, driveable vehicles" in the amounts of $10,000 and $20,000 respec-

tively, the "check for as is value", i.e., the net price, was stated to be $86,000. The letter also required AWSC or Warmus [41] to, *inter alia,* restore all eight cars to "proper running condition" by performing certain types of specified maintenance. (Exh. 10 or 16(10)).

Shortly after Warmus received the letter from Dee, a meeting with Cipparone took place. Cipparone had asked for an appraisal or an independent valuation of the assets. Tr. IV–B at 745 and 749. Because Cipparone did not readily have the ability to examine Promotion Programs' assets, Tr. IV–B at 740, he was willing to rely on Warmus' representations as to the market value, provided they were based upon an independent appraisal or valuation. Tr. IV–B at 739–50. Cipparone believed that the letter from Dee constituted both an appraisal and an agreement to purchase the collection cars. Tr. IV–B at 745. Cipparone agreed to release the lien because it is the practice of the IRS to discharge an asset from a lien to facilitate a sale provided that the IRS gets the value that the lien represents. Tr. IV–B at 751. If an appraisal had shown the collection cars were worth more than indicated in the Dee letter, e.g., $400,000, Cipparone would have expected to receive 70% – 75% of the cars' value. Tr. IV–B at 754.

---

**38.** It was important to Warmus that he retain control to sell the cars because if the IRS sold them he wouldn't get any money. Tr. IV–B at 864. Also, with regard to Warmus' share of the sale proceeds, the court finds that after Dee was made whole, Warmus would be able to retain the balance of all remaining proceeds because Dee had no profit motive; he only desired to do Warmus a favor and not lose any money. The court disbelieves Warmus' testimony regarding the existence of an agreement with Dee to pay Warmus a commission and reimbursement of expenses. Tr. V–A at 913–14; Tr. VI at 1363–65. Dee's testimony, given all circumstances, is much more credible: "[w]hen I purchased the cars in 1994 for $86,000, I did it on the basis that I thought I was helping Tom Warmus keep from having to let the cars go to the Internal Revenue Service. *My only intention was to expend $86,-000 and get back $86,000 and I didn't do it for an investment purpose.*" Tr. VIII at 2006.

**39.** Dailey testified she could not recall negotiating the loan and stated Warmus handled the financial transactions of American Way Financial Services Corporation. Tr. VIII at 1774–75.

**40.** These were the same cars listed as the "collection cars" on the Promotion Programs' schedule, Exh. 21A, which was shown to Cipparone. The court believes some of the cars were misdescribed by Dee, after his conversation with Warmus, when Dee prepared the letter. These were some of the cars that were sold, or attempted to be sold, at the Kruse auction over the next Labor Day weekend. See, e.g., Tr. VII at 1417–23 and the Kruse auction documents discussed and referred to *infra.*

**41.** The letter was addressed to "American Way Service Corp." but as "seller" it was signed by "T.A. Warmus" without any designation as to corporate capacity. This document is ambiguous as to whether the parent corporation or Warmus sold the cars. Although Promotion Programs owned all the collection cars, its name is nowhere to be seen on the agreement. This is another example of Warmus' disregard of corporate form.

During the discussions with Cipparone, Warmus' goal was to structure an acceptable offer of compromise with the IRS. Tr. IV–B at 820. Although Warmus' major justification for devising the sale of the collection cars to Dee was that he needed a deposit for the offer in compromise with the IRS, *see, e.g.,* Tr. V–A at 1120–24, this explanation does not ring true. *See, e.g.,* Tr. IV–B at 864.[42] The Warmus/AWSC offer and compromise did not require any deposit. Tr. IV–B at 738.

Warmus failed to tell Cipparone a number of important facts when he obtained Cipparone's consent to the Dee transaction. Warmus' nondisclosure of material facts included: (1) Dee was not an independent third party; (2) Dee owed AWSC approximately $225,000 at the time the letter was written; (3) no payments had been made on Dee's debt owed to AWSC from 1988 to 1993; (4) Warmus restructured the debt per Dee's request in 1993 when Dee threatened bankruptcy; (5) the Moreno Valley dealership was not purchasing or appraising the eight collection cars; (6) Dee had not seen the collection cars in years; (7) Dee did not set the price for the cars but the price was solely determined by Warmus; (8) Dee had never owned or dealt with these types of collection cars; (9) Dee knew nothing about the condition or value of the cars; (10) Dee wrote the letter as a favor to Warmus; (11) at the time Dee wrote the $86,000 check to purchase the vehicles, Dee had relied upon a "loan" from Warmus' wife's company, American Way Financial Services Corporation, to enable the transaction to occur; (12) Warmus had promised Dee that

Dee would not lose any money on the sale; (13) Warmus ·had already made arrangements, or had begun to make arrangements, to sell the collection cars at the Kruse auction that would occur in the near future; and (14) Warmus was setting, or intended to set, in conjunction with Cheek, the aggregate asking prices for the eight collection cars in an amount in excess of $400,000 (which is a far cry from the $86,000 "fair value" set forth in the Dee/Moreno Valley letter). Also Cipparone did not see AWSC's general ledger which showed the cars cost more than $400,000 and that the cars had not been depreciated because they were collectible cars.[43] Tr. IV–A at 614 and 635. As discussed in Part IV.C. below, ultimately the value of the eight vehicles was unquestionably shown to be far in excess of the $86,000 "purchase price" offered by Warmus (through Dee).[44] At the time the IRS was paid its $86,000 on September 22 or 23, 1994, sale proceeds from the vehicles received already totaled $63,750 with *five* cars still to be sold.

The court finds the real reason for the transfer to Dee was so Warmus could pay the least amount of money to the IRS as possible, keep control over all the collection cars, sell them for whatever price he solely deemed to be appropriate, and keep the profit for himself by transferring proceeds to relatives and friends. As Dee admitted, he was helping Warmus keep the cars out of the hands of the IRS. Tr. VIII at 2006. Dee's involvement and actions to facilitate Warmus' scam were not in good faith because Dee acted solely as an implement to accomplish

---

42. If an $86,000 down payment were actually required, Warmus could have easily arranged financing through Dailey's company, American Way Financial Services Corporation, with the loan to be paid back after sale of the cars. (After all, Dailey's company wrote a check to Dee for $70,000 to accomplish the sale.) Any excess proceeds from the sale of the collection cars would have remained with Promotion Programs rather than with Warmus individually. *However, both Warmus and Dailey admitted that the transaction with Dee was structured so the IRS would not get the collection cars and the proceeds would be sheltered from the IRS.* Tr. V–A at 1121–22; Tr. VIII at 1882.

43. Warmus testified that Howard gave Cipparone a complete set of the companies' balance

sheets. Tr. V–A at 920. The court believes Howard's testimony that Cipparone did not see the general ledger.

44. Three of the Dee cars were sold at the Kruse auction on September 5, 1994, eleven days after Dee's letter was faxed to Warmus. Three checks were endorsed over to Dee which totaled $63,750 that were deposited in Dee's account on September 9, 1994. Exh. 55; Tr. VIII at p.1997. It should be noted that Dee's check for $76,000 to "purchase" the vehicles was not deposited and honored until nearly two weeks later on September 22, 1994. Tr. VII at 1473; Tr. VIII at 1987–88.

Warmus' will.[45] The "sale" to Dee completely lacked any attributes of an arms-length transaction.[46]

At nearly the same time that Warmus was dealing with the IRS, he was making arrangements to take other assets owned by Promotion Programs, AWSC, or himself, and the sale proceeds therefrom, for his own benefit. For example, Promotion Programs owned a 1988 BMW 750i, which Warmus drove as a company car, and a 1988 Corvette, which Dailey drove as a company car. Exh. 21A. AWSC or Warmus also owned an ERA Cobra. Exh. 21B; Exh. 6A. Finally, a 1987 Ferrari Testarossa and a 1972 MG Lotus were owned by Warmus individually.[47] Thrown in for good measure were a 1970 Corvette convertible, a 1989 Pontiac Trans Am, and a 1957 Ford Thunderbird convertible. Exh. 55.[48] Warmus decided that these vehicles would also be sold at the Labor Day weekend Kruse auction.

Warmus had Cheek prepare all the cars for the auction. Cheek did the grunt work including arranging for repairs, detailing the cars, researching possible asking prices, making arrangements to transport the cars to the auction, filling out the paperwork to register the cars, etc. The out-of-pocket expenses (including meals and lodging) were said to be paid by Dailey's credit card.[49] The court finds that Warmus made all major decisions, including what cars would be sent to auction, the amount of the asking price for each car,[50] whether or not any given bid would be accepted,[51] and the ultimate initial payees or endorsed transferees who would receive the checks from the auction sale.[52] Dailey's involvement in paying any auction expenses is not in good faith. Warmus or Cheek used her credit card to carry out the sale for Warmus' benefit. This was not an arms-length transaction.

**45.** Warmus contacted Dee *not* because of experience because someone with experience could have "exploit[ed] it for their own benefit." Tr. VI at 1364–65.

**46.** Indeed, the first time Dee learned what cars had been sold by Warmus at the Kruse auction was in January 1997 at Dee's deposition. Tr. VIII at 2001.

**47.** The ownership of the Testarossa and the MG Lotus was the most heavily contested at trial. Warmus and Dailey each assert that the Ferrari Testarossa was owned by Dailey and the MG Lotus was owned by Tommy. Exh. 6A, which was maintained in the ordinary course of Debtor AWSC's business, states these vehicles are owned by "TAW", *i.e.*, Warmus, for "Investment" purposes. Trustee Feltman had Larry Streeter, a former employee of Debtor AWSC, print the document, admitted as Exh. 6A, *see* Tr. V–B at 1162–64, from the corporate computer records, on August 19, 1996. Although Warmus asserts the exhibit is erroneous, *see* Tr. V–A at 1074–75, and the Defendants' attorney implies it may have been created or manufactured for this litigation, the court finds the exhibit to be truthful and compelling. *See* discussion in Part IV.A.13, *supra*. Exhibit 6A is corroborated by other documents, i.e., the Kruse sale exhibit 55 which lists "Tom Warmus," rather than Dailey or Tommy, as the seller. This ownership finding is mandated—especially in light of the Defendants' inability to introduce any documentary evidence that negates or defeats the Trustees–Plaintiffs' exhibits. Based upon all testimony, and all admitted documentary evidence, the court finds the ownership of the "non-Dee" vehicles clear and con-

vincing. *See* factual findings regarding specific "other cars" in IV.C.2.a.–f. below.

**48.** One of the "Dee cars," a 1935 Ford pickup, was not offered for sale at the Kruse auction. Tr. V–A at 969–75.

**49.** The testimony was that Dailey wanted to accumulate credit card air-miles. However, almost no documentary evidence was introduced which showed what expenses were paid, in what amounts, and by whom. The major exception is that the Kruse auction deducted $2,100, for fourteen tent spaces at $150 each, from the proceeds of the sale from the 1987 Ferrari Testarossa. Exh. 55.

**50.** Dailey testified she did not set the reserve prices at the Kruse auction; she "leave[s] all that up to my husband." Tr. VIII at 1800.

**51.** Cheek testified he did not have authority to accept or reject bids at the Kruse auction. Tr. VII at 1609.

**52.** Warmus testified that although Cheek had some knowledge regarding the cars, Warmus was an "expert in these types of collector cars." Tr. V–A at 955–56. In describing himself, Warmus stated he was "very good with numbers," "he read auto magazines," "he saw what was going on in the market place," and he owned "a few dozen" exotic cars since the purchase of his first Ferrari in 1967. Tr. VI at 1352. The specific results of the auction regarding each car are discussed in much greater detail in Part IV.C.1. and 2. *infra*.

The Wellcraft Portofino boat, owned by Promotion Programs, docked behind Warmus' house in Florida, was also a problem. Tr. VI at 1294; Exh. 21A. How could Warmus keep that boat? Cipparone wanted it sold with the proceeds to be applied to the IRS lien. Tr. VI at 1296.[53] Warmus needed an appraisal for Cipparone and a "buyer" for the boat.

On or about September 14, 1994, Atlantic Yacht Brokers gave Warmus a letter stating the boat was worth "$50,000 cash to you" provided the boat "pases [sic] a new survey agreeable to me." Exh. G.[54] The first hurdle was cleared by Warmus. Next, Warmus needed a buyer.

Who else but Cheek? He had proved useful to Warmus in arranging to sell the Dee cars that were not sold at the Kruse auction.[55] In the "Publisher's Showcase" four of the unsold Dee cars were advertised: The 1969 DeTomaso Mangusta, the 1978 Lamborghini Countach "S", the 1978 Ferrari 308, and the 1979 Ferrari BB512 Boxer. The cars were advertised as "The Thomas Dailey Collection" (rather than the "Dee Collection")[56] and the telephone and fax numbers were those at Dailey's house. Exh. 10B; Tr. IV–B at 867–69.

During October or November 1994, Warmus approached Cheek with an offer to sell the Wellcraft Portofino boat for $40,000.[57] When Warmus first made this proposal, Cheek and Touchdown did not have funds to buy the boat.[58] Therefore, after Touchdown was formed and its Articles of Incorporation were filed on December 5, 1994,[59] Warmus arranged for Dee to transfer funds to Touchdown. Warmus suggested to Dee that they work with Cheek on a deal for the boat. Tr. IV–B at 816–19. Although Dee had never spoken with Cheek, Dee agreed to give Touchdown $40,000 because Warmus asked him to do so, Tr. VIII at 2007, without any promissory note and without any interest to be paid on this transfer of money. Id. at 2008.[60] Dee thought that AWSC, Promotion Programs, and Warmus were "one in the same thing" and he would not have given money to Touchdown except for Warmus requesting that he do so. Tr. VIII at 2011.[61] Of course, "buying" the boat was a good deal because Cheek or Touchdown would pay

**53.** Cipparone's testimony regarding the boat is somewhat hazy. He believes he got an appraisal from Warmus regarding the boat and he got money that represented the value of the boat; however, he is uncertain whether the boat was sold "during his involvement." Tr. IV–B at 753.

**54.** Given Cipparone's testimony, it is reasonable to conclude he saw this letter.

**55.** After Dee "purchased" the vehicles, he "did nothing with them." Dee relied upon Warmus to handle any sales. Although Dee did not know Cheek, he hired him based upon Warmus' representations. Tr. VIII at 1952–53 and 1999. Cheek had no arrangement for his corporation, Touchdown, to be paid: the fees would be "netted out at the end when the cars were sold" and the fee was "undetermined." Tr. VII at 1668. Cheek or Touchdown never sent a bill to Dee for services rendered or any oral accounting regarding vehicles sold or prices received. There was nothing in writing whereby Dee authorized Cheek or Touchdown to market or sell the remaining vehicles. Tr. VII at 1676.

**56.** This collection is designated by combining Warmus' first name with his wife's last name. This further supports the court's findings that these cars were not really "sold" to Dee; they were only put into his name for Warmus' benefit and convenience.

**57.** This boat was originally purchased by Promotion Programs on December 1, 1987, at a cost of $171,519. Tr. IV–A at 641.

**58.** Although the testimony was that Touchdown would buy the boat, that corporation had not yet been formed. The Articles of Incorporation were not filed with the State of Florida until December 5, 1994. Exh. 12.

**59.** It should be remembered that this occurred just after the bankruptcy filings of Warmus on December 1, 1994, and AWSC on December 2, 1994.

**60.** Cheek testified that Warmus set the price of the boat, Exh. 11, p. 273, that Cheek could not recall ever speaking to Dee about the loan, Id., the repayment of the loan had no specific terms, Id. at 293–94, but that the interest rate on the repayment was "fixed at around seven or eight percent." Id. at 295–96.

**61.** Dee would do what Warmus asked. At this time, Dee had received $133,750 from Warmus (i.e., the $70,000 loan and $63,750 from the sale of the three cars at the Kruse auction) but had only returned $86,000 to Warmus/Promotion Programs to pay the IRS. Dee was then $47,750 ahead of the game.

$40,000 for a boat that a broker "three months before said was worth $50,000 cash to the seller." Tr. VII at 1697. This was especially true because Cheek or Touchdown did not need to put up any money whatsoever. Warmus obtained the "loan" from Dee to Touchdown as a "handshake deal"; Cheek never met Dee. *Id.* at 1692–93.[62] In this transaction, Cheek was a strawman to form Touchdown for Warmus' benefit.[63]

Touchdown received a check for $40,000 dated December 12, 1994 and deposited that check on December 15, 1994. Exh. E. Meanwhile, on December 14, 1994, Touchdown wrote a check to Promotion Programs in the amount of $40,000 that was honored on December 28, 1994, by NationsBank. Exh. B. Warmus kept his boat, albeit in Touchdown's name, by using a portion of Dailey's corporation's original "loan" to Dee and the proceeds from the sale of three cars at the Kruse auction. Funds were recycled by Warmus. Promotion Programs forwarded the $40,000 to the IRS which was the "representative value" of the boat. The IRS had been flim-flammed again.

The sale of the boat needed to be documented. It was not until April 21, 1995, that Promotion Programs gave Touchdown a Bill of Sale, signed by Warmus, making the transfer effective as of that date. Exh. B. On June 13, 1995, the State of Florida issued a vessel registration to Touchdown for the boat. Exh. C. On July 7, 1995, the State of Florida issued a Vessel Certificate of Title to Touchdown. Exh. D. A subsequent boat registration was issued on July 31, 1996, which expired on June 30, 1997. Exh. C.

At the time of the transfer of the eight collection cars to Dee, the sale of some of the "Dee cars" and other cars at the Kruse auction, and the transfer of the boat to Touchdown, Warmus and AWSC, jointly and severally, owed in excess of $2,000,000 to Wynn Oil Company. Exh. 38B and 38C; Tr. I at 214–15; Tr. II at 353; Tr. VII at 1438; see also Exh. 57. Wynn Oil was attempting to execute on Warmus' AWSC stock and gain control of all other Warmus' companies to satisfy its indebtedness. AWSC and Warmus then filed for bankruptcy so Wynn Oil could not seize the stock and to cease other litigation commenced by seven automobile dealers against AWSC. Tr. VII at 1438–39.

Also, at the time of the transfers, the IRS was jointly and severally owed unpaid taxes by AWSC, the holding company, and its subsidiaries, including Promotion Programs, which had filed consolidated tax returns. Tr. IV–A at 594; Exh. W at 10. The IRS held a tax lien in the amount of approximately $7,500,000. Tr. VI at 1339; Tr. IV–B at 751. After negotiations with the IRS, an informal offer and compromise was submitted in August or September 1994. Tr. IV–B at 780; Exh. W (Gans' October 7, 1994, statement for services rendered). An original offer and addendum thereto was submitted on or about November 9, 1994. Exh. 48A. On or about November 29, 1994, the IRS accepted the offer in compromise, after an Offer Acceptance Report was signed on November 16 and 17, 1994. Exh. 48A.

---

**62.** It must be reiterated that the "loan" from Dee to Touchdown was not documented by using any promissory note or ship mortgage. Tr. VI at 1298; Tr. VIII at 2007–08.

**63.** Facts supporting this finding include: (1) although Touchdown was purportedly formed to deal in real estate, it never developed, bought, or sold, any realty; (2) Warmus' attorney, Gold, formed the corporation pursuant to Warmus' recommendation; (3) Cheek continued to live in Michigan but Touchdown's mailing address was a post office box a short distance from Warmus'/Dailey's Florida residence; (4) there is supposedly only one key to the Touchdown post office box and Cheek mailed the key to Dailey to open the box and help him out; (5) Touchdown opened a bank account in Florida and, on at least one occasion, Dailey made a deposit; (6) Cheek and Touchdown had no money to buy the boat so Warmus obtained the funds for Touchdown's use; (7) and, most important, Cheek, through Touchdown, as a result of Warmus' request, "bought" the boat to "help out Mr. Warmus." Exh. 11, pp. 371 and 376. Muir, Warmus' mother-in-law, signed the Articles of Incorporation for Touchdown as the notary public. Tr. IV–B at 805; Tr. VIII at 1839. Also, after the boat was "sold" to Touchdown, but before the sale was documented, Touchdown, for some inadequately explained reason, paid Warmus' attorney, Morganroth, the sum of $5,000. Tr. VII at 1672; Tr. VIII at 1879. Although Warmus testified that he did not arrange for Cheek to form Touchdown, Tr. IV–B at 806, the court disbelieves this testimony.

On December 30, 1994, AWSC filed its motion to obtain approval of the proposed offer in compromise in the United States Bankruptcy Court for the Southern District of Florida. Exh. 48A. The settlement with the IRS was approved by the bankruptcy court and AWSC's obligation was paid in full some time during March, 1995. Tr. VI at 1310–12; Tr. V–B at 1176–80. During the time in which transfers of the various cars and the boat took place, the IRS was a creditor, within the meaning of § 101(10) of the Bankruptcy Code, of Warmus, AWSC, Promotion Programs, and the other AWSC subsidiaries who had filed the consolidated tax returns.

### C. Facts Regarding the Specific Cars, Boat and Plane.

#### 1. The "Dee Cars".

There were eight collection cars transferred to Dee by Warmus. See Exh. 10 and 16(10) and n. 33 *supra.* Each is discussed below.

#### a. 1926 Ford Speedster.

This car was listed at the Kruse auction for sale as a "1926 Ford Model T Speedster" with a reserve sale price set by Warmus/Cheek at $20,500. Exh. 55. This car was sold for a net amount of $18,260 per the Kruse check dated September 5, 1994, made payable, not to Dee, but to Dailey. The check was then endorsed from Dailey to Dee.

The transferor and owner of this car was Promotion Programs. Exh. 21A. The initial transferee of the car was Dee. The subsequent transferees of the proceeds were Dailey and Dee. Neither Dee nor Dailey took their transfer "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid by Dailey, Dee, Warmus, or Cheek, to market and sell the car, e.g., by use of Dailey's credit card, is not entitled to any lien or offset against the sale proceeds under § 550(e) of the Bankruptcy Code because those persons are not "good faith transferees." The best evidence of value at the time of the transfers is the net sale price received, i.e., $18,260.00.

#### b. 1978 Auburn Boat Tail Speedster.

This car was listed for sale at the Kruse auction as a "1978 Auburn Glen Pray Speedster (Engine 460)" with a reserve sale price set by Warmus/Cheek at $25,000. Exh. 55. This car was sold for a net amount of $27,000 per the Kruse check dated September 5, 1994 made payable, not to Dee, but to Dailey. The check was then endorsed from Dailey to Dee.

The transferor and owner of this car was Promotion Programs. Exh. 21A. The initial transferee was Dee. The subsequent transferees of the proceeds were Dailey and Dee. Again, neither Dee nor Dailey took their transfer "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid by Dailey, Cheek, Warmus, or Dee, to market or sell the car, e.g., by use of Dailey's credit card, is not entitled to any lien or offset against the sale proceeds under § 550(e) of the Bankruptcy Code because those persons are not "good faith transferees". The best evidence of value of this car at the time of the transfers is the net sale price received, i.e., $27,000.

#### c. 1935 Ford Pickup.

This car was owned by Promotion Programs before it was transferred to Dee; its cost value was $5,500. Exh. 21A. This car was apparently listed at the Kruse auction for sale with a reserve price of $1,000. Per Warmus' testimony it was sold at auction for approximately $3,000, "plus or minus $500." Tr. VII at 1423; *see also* Tr. V–A at 1115–16. However, there are no Kruse documents admitted into evidence that show the reserve asking price, the sale price, to whom the check was payable, or any subsequent transferee of the proceeds. The court is therefore uncertain whether this car was sold at the Kruse auction or, more likely, at a later time.

Exhibit 16(10) states the value of this car to be $1,000. Cheek testified that there was "an allocation of the amounts that [Dee] essentially paid for [the collection cars]" and Cheek had seen the allocation "in writing somewhere." Exh. 11 at 171–72. The court finds, based upon logic and all circumstances

and evidence in the record, that the notations on Exhibit 16(10) show the sale price allocation for the eight collection cars "sold" to Dee. Rather than relying on Warmus' oral testimony regarding the sale price, the court finds that, in this instance, the best evidence of value is that set forth in the exhibit, i.e., $1,000. *See* discussion in Part IV.A.13.

There is no documentary evidence in the record to show which person received the proceeds from the sale. The court is therefore unable to make any finding regarding whether a subsequent transferee of the sale proceeds exists. Dee is not entitled to any lien or offset under § 548(c) of the Bankruptcy Code because he did not take the transfer "for value and in good faith".

### d. *The 1979 Porsche Turbo.*

This car was listed for sale at the Kruse auction as a "1979 Porsche Custom Turbo Targa (Engine V–8)" with a reserve amount of $20,000 set by Warmus/Cheek. Exh. 55. This car was sold for a net amount of $18,490 per the Kruse check dated September 5, 1994, made payable, not to Dee, but to Warmus. The check was then endorsed by Warmus to Dee.

The original transferor and owner of this car was Promotion Programs. Exh. 21A. The initial transferee of the car was Dee. The subsequent transferees of the proceeds from the sale were Warmus and Dee.[64] Neither Warmus nor Dee took their transfer "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid to market or sell the car by Warmus, Dailey, Cheek or Dee, e.g., by use of Dailey's credit card, is not entitled to any lien or offset against the sale proceeds because none of those persons is a "good faith transferee" under § 550(e) of the Bankruptcy Code. The best evidence of value at the time of the transfers of this car is the net sale price received at the Kruse auction, i.e., $18,490.

### e. *1969 DeTomaso.*

This car was owned by Promotion Programs before it was transferred to Dee. Exh. 21A, 10, and 16(10). The car was listed at the Kruse auction for sale as a "1969 Pantera DeTomaso Mangusta (Engine V–8)" with a reserve sale price set by Warmus/Cheek at $40,000. Exh. 55. A final bid was received to purchase the car for $35,000 but that offer was rejected. Exh. 55; Tr. V–A at 1028.

Some time after the Kruse auction, Jay Landsman offered to buy the DeTomaso for $39,000. He was a doctor in New Jersey and there is no evidence that he is related to Warmus. Tr. V–A at 1028. Landsman remitted two checks. The first check was payable to Promotion Programs, dated January 3, 1995, in the amount of $15,000. That check was endorsed by "Thomas A. Warmus, Pres.," and deposited in the Touchdown bank account in Florida. The other check was also dated January 3, 1995 and made payable to Touchdown in the amount of $24,000. The endorsement on this check is "For Deposit Only, Touchdown Development Corp. [account number]" without any signature.

The initial transferee of the car was Dee. The subsequent transferee of the sale proceeds was Touchdown. Neither Dee nor Touchdown took their transfer "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid by Touchdown, Dailey, Cheek, or Warmus to market or sell the car is not entitled to any lien or offset against the sale proceeds under § 550(e) of the Bankruptcy Code because those persons are not "good faith transferees." The best evidence of the value of this car at the time of the transfers is the sale price received from Landsman, i.e., $39,000.

### f. *1978 Ferrari 308.*

This car was owned by Promotion Programs before it was transferred to Dee. Exh. 21A, 10 and 16(10). The car was listed for sale at the Kruse auction as a "1978 Ferrari 308 GTS Turbo (Engine 8 Cyl.)" with a reserve amount of $50,000 set by War-

---

**64.** Of course, Warmus has no transferee liability under § 550 of the Bankruptcy Code because he was dropped as a defendant and therefore can-

not be held liable in this litigation. *See* n. 1 *supra.*

mus/Cheek. Exh. 55. A final bid was received to purchase the car for $38,000, but that offer was rejected. Exh. 55.[65] Gary Lowe, who owned Winner's Dodge,[66] saw the Ferrari at the Kruse auction and expressed an interest in the car. Tr. V–A at 983. On or about August 28, 1994, Warmus, as president of Promotion Programs, executed a Michigan Vehicle Certificate of Title which transferred the Ferrari to Winner's Dodge, Inc. Exh. 53G.[67] Some time after the auction, Warmus personally delivered the car to Lowe. Tr. V–A at 983. Warmus testified that delivery took place in September, 1995. Tr. V–A at 994. Therefore, delivery took place over one year after Warmus signed the Vehicle Certificate of Title. Exh. 53G.

Winner's Dodge paid $42,999.60 for the car. The consideration was paid in five parts and was paid in accordance with Warmus' requests. Tr. IV–A at 674–98. First, on September 26, 1995, $5,000 was paid to Touchdown. Exh. 53B and D. Second, on or about December 12, 1995, Muir received a 1996 Dodge from Winner's for a total price, i.e., value, of $15,952.40. Exh. 53E. Third, on April 24, 1996, another $5,000 was paid to Touchdown. Exh. 53C and D. Fourth, on or about May 9, 1996, Howard signed the paperwork for a 1993 Dodge van for a total price, i.e., value, of $10,774.[68] Exh. 53F. The fifth and final payment, in the amount of $6,273.20 was paid to Touchdown on September 12, 1996.

Muir does not know how she received the vehicle and believes she received it as a "severance." Tr. III at 458–61. However,

Muir does not remember performing any services for Promotion Programs or AWSC. *Id.* at 455. Warmus testified that he asked Lowe to "work out a deal for my mother-in-law on a car and he did so"; however, Muir did not pay for the car she received. Tr. V–A at 997. Warmus stated Howard had a bonus coming from AWSC and the van was given to him. *Id,* at 1005. However, Howard testified that when he left his AWSC employment in November, 1995, he was owed approximately $1,000–$3,000 for unpaid wages and no other money. Tr. IV–A at 605–06. Howard received the van from Winner's Dodge in the springtime, May, 1996, and he did not pay for it. *Id.* at 606. Although Warmus testified the vehicles given to Muir and Howard were not part of the consideration for the sale of the Ferrari, the court disbelieves him. Winner's Dodge's records, buttressed by Gary Lowe's testimony, are much more believable. Tr. IV–A at 698–99; *cf.* Tr. V–A at 986–87.

The best evidence of the value of the car at the time of the transfers is the aggregate price paid by Winner's Dodge, i.e., $42,-999.60. The initial transferee of the car was Dee. The subsequent transferee was Winner's Dodge. The subsequent transferees of the proceeds received from Winner's Dodge were: Touchdown—$16,273.20; Muir—$15,-952.40; and Howard—$10,774.

Winner's Dodge took the vehicle "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code.[69] However, neither Dee, Touchdown, Muir, nor Howard

---

65. Although the bid was rejected, Warmus believes the $38,000 amount is not accurate because "we would have sold the car at that time for that price." Tr. V–A at 980–82. The court disbelieves Warmus because the date on the Kruse final bid document, i.e., the Purchase Invoice and Bill of Sale, is September 3, 1994. Warmus already sold the car *prior* to September 3, 1994, although it was delivered later. Exh. 55, Exh. 53G and text below.

66. He is the president, vice-president, treasurer, and secretary of that corporation.

67. The date of Warmus' signature on the title is during the Kruse auction. No Michigan vehicle title history was entered into evidence to show when, if at all, the Michigan Secretary of State recorded the transfer of ownership of the car.

68. Howard testified he received the van approximately one year before he signed the paperwork. Tr. IV–A at 607. Warmus and Dailey wanted the van "off the books." *Id.*

69. Although Warmus and Lowe were friends and Winner's Dodge owed AWSC a large amount of money, Tr. V–A at 985–86, the evidence at trial does not support a finding that Winner's Dodge or Lowe participated in Warmus' scheme to defraud creditors. The court believes that Lowe wanted the car and Warmus allowed him to purchase the car by making payments over a period of time, at such times when Warmus needed money. Tr. IV–A at 693–94.

took their transfers "for value and in good faith." Money that may have been paid, if any, by Dee, Touchdown, Muir, or Howard, in connection with the transfers is not entitled to any lien or offset against the sale proceeds under § 550(e) of the Bankruptcy Code.

### g. *1979 Lamborghini and 1979 Ferrari Boxer.*

Both of these cars were owned by Promotion Programs before they were transferred to Dee. Exh. 21A and Exh. 10. At the Kruse auction the Lamborghini was listed for sale as a "1979 Lamborghini Countach S (Engine 4.0 Litre)" with a reserve amount of $90,000 set by Warmus/Cheek. Exh. 55. A final bid was received to purchase the Lamborghini for $90,000 but the sale was not consummated. Exh. 55.[70] At the Kruse auction the Ferrari was listed for sale as a "1979 Ferrari Boxer 512 Coupe (Engine V–12)" with a reserve amount of $170,000 set by Warmus/Cheek. Exh. 55. A final bid to purchase this Ferrari was received in the amount of $130,000. Exh. 55. The bid was not accepted.[71]

The 1979 Lamborghini and the 1979 Ferrari Boxer have not yet been sold. Tr. VII at 1620. After the Kruse auction the unsold cars were taken back to Warmus' residence in Franklin, Michigan. *Id.* at 1613.

Sometime later, these two cars were moved to "Shur Guard Storage" in Walled Lake, Michigan. Exh. 11, pp. 9–13.[72] The cars were now located at a storage facility in Michigan pursuant to a preliminary injunction granted by Judge Ray. Tr. II at 268.

At a prior court hearing on August 20, 1997, the Plaintiffs–Trustees sought authority to sell the 1979 Lamborghini and the 1979

Ferrari Boxer at the Kruse auction scheduled for the 1997 Labor Day weekend. Exh. 27. Dee, through his attorney, opposed the sale unless the reserve prices were set at $90,000 for the Lamborghini and $135,000 for the Ferrari Boxer. Exh. 27 at pp. 18–21.[73]

The initial transferee of these two cars was Dee. There exist no subsequent transferees. Dee did not take the transfer of these cars "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid to attempt to sell these cars by Warmus, Dailey, Cheek, Touchdown, or Dee is not entitled to any lien or offset under § 550(e) of the Bankruptcy Code because none of those persons is a "good faith transferee."

Promotion Programs listed the Lamborghini at a book value of $92,888 and the Ferrari Boxer at a book value of $83,521. Exh. 21A. The reserve prices at the Kruse auction in 1994 were $90,000 and $170,000 respectively. The bids received in 1994, per the Kruse documents, were $90,000 and $130,000 respectively. In August 1997, Dee's attorney argued that the reserve prices at an auction sale should be $90,000 and $135,000 respectively. Given this evidence, the court believes the best evidence of the values to be the bids that were made during the 1994 Kruse auction. These bids were made within ten days after the transfer of these cars to Dee. At the time of the transfer of these two collection cars to Dee, the value of the 1979 Lamborghini was $90,000 and the value of the 1979 Ferrari Boxer was $130,000.

### h. *Summary of Transferees of Dee Cars and/or Sale Proceeds Therefrom.*

Dee's transfer for all eight collection cars totals $336,739.60.[74] Dailey's transfer of pro-

---

**70.** Warmus testified that the Kruse document showing a $90,000 final bid is wrong. Tr. V–A at 957–59. Cheek testified that Warmus would have determined whether to sell the Lamborghini that was listed at $90,000. Tr. VII at 1661.

**71.** Warmus stated he was present when this car was auctioned and he does not believe there was ever a $130,000 bid. Tr. V–A at 965.

**72.** The Plaintiffs–Trustees learned of the location of these two cars at Cheek's deposition which took place on January 6, 1997. See Exh. 11.

**73.** Dee's attorney conceded those values were reasonable minimum values. Judge Ray stated the asserted values would bind Dee at the trial of this adversary proceeding. Exh. 27 at 20–21.

**74.** The court has only added the values of the cars received by Dee. Checks given to Dee from the proceeds of sales have not been included in this calculation because this would result in double-counting.

ceeds total $45,250.[75] Touchdown's transfer of proceeds total $55,273.20.[76] Muir's transfer is $15,952.40.[77] Howard's transfer is $10,774.[78]

### 2. *The Other Cars.*

#### a. *The 1988 BMW 750 and the 1988 Corvette.*

These cars were not transferred to Dee. Exh. 10 and 16(10). Both of these cars were owned by Promotion Programs and listed as "business cars" at the 1994 Kruse auction. Exh. 21A. At the auction, the BMW was listed for sale as a "1988 BMW 750 L Hardtop (Engine V–12)" with a reserve amount of $28,000 set by Warmus/Cheek. Exh. 55. A final bid for the BMW was received in the net amount of $27,075 which was accepted by Warmus. At the auction, the Corvette was listed for sale as a "1988 Chevrolet Corvette Anniversary (Engine 350)" with a reserve amount of $16,000 set by Warmus/Cheek. Exh. 55. A final bid for the Corvette was received in the net amount of $23,000 which was accepted by Warmus. Exh. 55.

Warmus testified that Dailey and he purchased the 1988 BMW and the 1988 Corvette for "wholesale" and then auctioned the cars at the Kruse auction. Tr. V–A at 1059. The cars were "purchased" at the same time "we did the Gary Dee one." *Id.* The cars were not retitled from Promotion Programs to Warmus or Dailey. Tr. V–A at 1061. Cipparone did not know Warmus and Dailey were purchasing the 1988 BMW and the 1988 Corvette from Promotion Programs. Tr. V–A at 1062.

Dailey testified that the 1988 BMW was owned by Promotion Programs and driven by Warmus. Tr. VIII at 1814–16. Dailey "bought" the 1988 BMW and the 1988 Corvette and sold them in an amount greater than the purchase price before she paid for the two cars. Tr. VIII at 1815–17. *After* the sale of the cars, she paid the purchase price and she (and Warmus) pocketed the difference. *Id.*

The Kruse auction documents show that the net sale proceeds check for the 1988 BMW dated September 5, 1994, in the amount of $27,075.00 was payable to Warmus and then endorsed to Dailey "for deposit only". Exh. 55. The sale proceeds check for the 1988 Corvette, dated September 5, 1994, was made payable to Dailey in the amount of $23,000. Therefore, Dailey received $50,-075.00 from the sale of these two cars. After receipt of the sale proceeds, $23,000 was paid to Promotion Programs for the two cars. Tr. IX at 2110–11.[79]

The initial transferee of these two cars was Dailey. There exist no subsequent transferees, other than Warmus, who is not liable as a defendant. Dailey did not take the transfer of these cars "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid by Dailey, or the other Defendants, e.g., by use of Dailey's credit card, is not entitled to any lien or offset under § 550(e) of the Bankruptcy Code because no "good faith transferees" exist.

The court believes the best evidence of value at the time the transfer to Dailey took place is the net sale proceeds of the vehicles, as evidenced by the Kruse auction checks, i.e., $50,075.00.

#### b. *The 1957 Ford Thunderbird.*

This car was not owned by Promotion Programs, Exh. 21A, nor was it transferred to Dee. Exh. 10 and 16(10). The car was owned by Warmus as an investment. Exh. 6A. At the Kruse auction, the seller was Warmus and the car was listed for sale as a "1957 Ford Thunderbird Cvt (Engine V–8)" with a

---

75. The 1927 Ford Speedster sale proceeds were $18,250 and the 1978 Auburn sale proceeds were $27,000.

76. The 1969 DeTomoso proceeds were $39,000 and the 1978 Ferrari 308 proceeds given to Touchdown were $16,273.20.

77. This is the value of the vehicle she received from Winner's Dodge.

78. This is the value of the vehicle he received from Winner's Dodge.

79. Warmus testified that these two cars were sold to "raise additional cash for the corporations." Tr. V–A at 1062. If so, why were all the proceeds not deposited into Promotion Programs' or AWSC's bank account?

reserve amount of $25,000 established by Warmus/Cheek. Exh. 55. A final bid was received in the amount of $25,000 which apparently was not accepted. Exh. 55.

Although this car was later sold "privately", there is no evidence in the record of who purchased the vehicle or the sale price. Tr. V–A at 1103–05. Although it would seem that Warmus, as owner, would have received the sale proceeds, the subsequent transferee, if any, of the sale proceeds is unknown.

### c. *1970 Corvette Convertible.*

This car was not owned by Promotion Programs, Exh. 21A, nor was it owned by Warmus or AWSC. Exh. 6A. The car was not transferred to Dee. Exh. 10 and 16(10). Warmus testified the car was owned by Tommy. In this instance, the court believes Warmus' testimony.[80]

At the Kruse auction, after sale of this vehicle, the net proceeds in the amount of $24,500 were paid to Tommy. Exh. 55. Because Tommy owned this Corvette, the Trustees are not entitled to claim the proceeds or recover them from Tommy.

### d. *1982 ERA Cobra Roadster.*

This car was not owned by Promotion Programs, Exh. 21A, nor was it transferred to Dee. Exh. 10 and 16(10). The car was owned by Warmus as an investment, Exh. 6A, or it was owned by AWSC. Exh. 21B.[81] Warmus asserts the ERA Cobra was owned by Tommy. Tr. V–A at 1073–75. The court gives no weight to Warmus' testimony about this car.[82]

At the auction, this car was listed for sale as a "1982 ERA Cobra Roadster Repl. (Engine 427)" with a reserve amount of $43,000 set by Warmus/Cheek. Exh. 55. A final bid was received in the gross amount of $48,000, which was accepted by Warmus.[83] After deductions, a check for the net sale proceeds of $45,400 was paid to Dailey. The check was then endorsed by Dailey to Kathleen. Exh. 55.

The original transferor was Warmus or AWSC. The initial transferee of the net sale proceeds was Dailey. The subsequent transferee of the net sale proceeds was Kathleen. Neither Dailey nor Kathleen took their transfer "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid to market or sell this car by Warmus, Dailey, Cheek, Tommy or Kathleen, e.g., by use of Dailey's credit card, is not entitled to any lien or offset against the sale proceeds because none of those persons is a "good faith transferee" under § 550(e) of the Bankruptcy Code. The best evidence of value at the time of the transfers of this car is the net sale price received at the Kruse auction, i.e., $45,400.

### e. *1972 MG Lotus.*

This car was not owned by Promotion Programs, Exh. 21A, nor was it transferred to Dee. Exhs. 10 and 16(10). This car is listed as being owned by Warmus as an investment. Exh. 6A. Warmus testified that the MG Lotus was owned by Tommy. Tr. V–A at 1094;

---

**80.** Although there are no documents in evidence to support Warmus' testimony, there are no documents in evidence which contradict his testimony. See discussion in Part IV.A.13. *supra.*

**81.** It is not legally relevant whether this car was owned by Warmus or AWSC. The trustees have agreed, pursuant to court approval, to split the recoveries from these avoidance actions. If ownership is legally relevant, the court finds, by preponderance, that Warmus was the owner. In addition to being listed as the owner on Exh. 6A, he is listed as the "seller" on the Kruse auction documents. Exh. 55.

**82.** The documents are more believable. See discussion in Part IV.A 13. *supra.* Also, Cheek testified that Tommy was at the Kruse auction.

Tr. VII at 1608–09. If Tommy owned the vehicle, the Kruse auction records could have easily been corrected to list Tommy as the seller with the sale proceeds paid to him. After all, a similar correction was made regarding the 1970 Corvette convertible discussed in Part IV.C.2.c. immediately above.

**83.** In passing, it is interesting to note that in the AWSC document, dated July 14, 1994, submitted to the IRS in connection with the offer in compromise negotiations, the ERA Cobra was listed as having an estimated market value of only $5,000. Exh. 21B.

Exh. Y.[84] However, at the Kruse auction, Warmus, with his Franklin, Michigan address, is listed as the "seller". Although this is a difficult ownership question, Exh. 6A is the most compelling evidence, and the court finds this car was owned by Warmus, and not by Tommy.[85]

At the auction, this car was originally listed for sale as a "1985 Lotus II Replicar." Later, in handwriting, the description of the car was changed to a "1972 MG Lotus II Replicar (Engine Mazda 12A Rot.)." The reserve amount of $25,000 was set by Warmus/Cheek. Exh. 55. A final bid was received and accepted by Warmus in a gross amount of $16,000. The net sale proceeds of $15,000 were paid to Dailey, and not to Tommy. Dailey then endorsed the check, not to Tommy, but to Kathleen. Exh. 55.

The transferor was Warmus. The initial transferee of the net sale proceeds was Dailey. The subsequent transferee of the net sale proceeds was Kathleen. Neither Dailey nor Kathleen took their transfer "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid to market or sell this car by Warmus, Dailey, Cheek, Tommy, or Kathleen, e.g., by use of Dailey's credit card, is not entitled to any lien or offset against the sale proceeds because none of those persons is a "good faith transferee" under § 550(e) of the Bankruptcy Code. The best evidence of value at the time of the

transfers is the net sale price received at the Kruse auction, i.e., $15,000.

### f. *1987 Ferrari Testarossa.*

This car was not owned by Promotion Programs or AWSC. Exh. 21A and 21B. This car is listed as being owned by Warmus as an investment. Exh. 6A.

Warmus and Dailey each testified that this car was owned by Dailey. Tr. VIII at 1805; Tr. IX at 2066–67. There was no title to this car and although Dailey asserts she had a bill of sale, she does not now have one because the car was sold. Tr. VIII at 1805–06. The only document which was admitted into evidence to support Warmus' and Dailey's testimony is a check in the amount of $113,000 payable from Dailey to Warmus and a "Transaction Advice" which shows $113,000 was withdrawn from Dailey's money market fund at Dreyfus. Exh. II.[86] However, none of the documents admitted into evidence demonstrates that Dailey bought the car or owned the car. Warmus stated there was no title showing Dailey was the owner, that he did not have a manufacturer's certificate of origin showing Dailey as the owner, and he did not recall any piece of paper which showed who owned the vehicle. Tr. IX at 2068. There was also no certificate of insurance, or an insurance policy, which showed ownership of the vehicle and no maintenance bills which showed the name of the owner. *Id.* at 2069. However, the Kruse auction documents show Warmus as the owner.

---

84. Exhibit Y shows the MG kit car was sold to "Thomas Warmus" for $13,581 in July 1983. This exhibit is ambiguous because it does not reference "Thomas Aloysius" or "Thomas Alan". Although Tommy was only 15 years old at the time of purchase, it is possible that Warmus could have bought this car for Tommy. Although the car was not registered, it may have had a title. Tr. VII at 1449. However, no title, or Michigan title history, which would show the owner, was admitted into evidence.

85. Again, as was the case with the 1970 Corvette Convertible, Tommy was at the auction. The Kruse documents could have been corrected to list Tommy as the seller with the proceeds of sale paid to Tommy. *See* n. 82 *supra.* This was not done.

86. This exhibit was not timely disclosed by the Defendants as required by Judge Ray's pretrial order. At the trial proceedings on March 12,

1998, the court initially declined to admit this exhibit because of improper nondisclosure. Upon additional consideration, and because the trial was continued to a later date to permit the Plaintiffs' attorneys an opportunity to consult with a handwriting expert regarding the PR/PS corporate recordbook, the court reserved ruling regarding admissibility of the $113,000 check. Tr. VIII at 1913 *et seq.* On the last day of the continued trial, April 28, 1998, over the Plaintiffs' objection, the court admitted Exh. II, which included a photocopy of the $113,000 check. The court also admitted Exh. OO, which was the original $113,000 check. However, the court refused to admit other newly-offered exhibits, namely Exhibits JJ, KK, LL, MM, and NN. The Defendants again failed to timely disclose those exhibits to Plaintiffs' attorneys as required by the pretrial order. Tr. IX at 2048–64.

Based upon the corporate records, Exh. 6A, and the Kruse auction documents, Exh. 55, the court finds that Warmus owned the Ferrari Testarossa.

At the auction, this car was listed for sale as a "1987 Ferrari Testarossa Coupe (Engine V–12)." The reserve amount of $1,000,000, sic. $100,000, was set by Warmus/Cheek.[87] A final bid was received and accepted by Warmus in the gross amount of $72,000. The Kruse auction deducted $3,600 to pay for a commission and fourteen tent spaces at $150 each. Tr. IX at 2076–77. A check for the net proceeds, in the amount of $66,300 was paid to Dailey. Shortly thereafter, Dailey endorsed the check to Muir.[88]

The transferor of this car was Warmus. The initial transferee of the net sale proceeds was Dailey. The subsequent transferee of the net sale proceeds was Muir. Neither Dailey nor Muir took their transfer "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid to market or sell this car by Warmus, Dailey, Cheek, Tommy, or Muir, e.g., by use of Dailey's credit card, is not entitled to offset against the sale proceeds because none of those persons is a "good faith transferee" under § 550(e) of the Bankruptcy Code. The best evidence of value at the time of transfer of the car is the net sale price of $66,300 plus the cost offset by

Kruse for the fourteen tent spaces at $150 each, which total $2,100. The value is therefore $68,400 which was received, or constructively received, by Dailey. However, Muir only received $66,300 from Dailey.

g. *Summary of Transferees of the "Other Cars" and/or Sale Proceeds Therefrom.*

The value of the five [89] cars transferred totals $178,875. Dailey's transfers of proceeds total $178,875.[90] Transfers of proceeds to Kathleen total $60,400.[91] Muir's transfer of proceeds is in the amount of $66,300.[92]

### 3. *The Boat.*

The Wellcraft Portofino 43 foot boat ("Boat") was purchased by Promotion Programs when the Boat was new. Tr. VI at 1294–95.[93] After its purchase, the Boat was kept behind Warmus' and Dailey's residence at Lighthouse Point, Florida. The cost of maintaining the Boat was paid by Promotion Programs. Tr. IV–A at 641.

The IRS had a tax lien on the Boat and Warmus therefore arranged its sale to Touchdown through Cheek. Tr. VI at 1296; Tr. VII at 1626–28. After the "sale" to Touchdown was documented, Cheek began marketing the Boat. On June 20, 1996, Touchdown listed the Boat for sale for $90,-

---

**87.** The court agrees with Warmus' statement that the reserve amount of $1,000,000 is a typographical error. The reserve amount should have been $100,000. See, e.g., Exh. 6A which lists the cost of the vehicle at $113,000. Also, the sale price accepted at the auction demonstrates the reserve amount of $1,000,000 was erroneous.

**88.** The funds were placed in Muir's account to prevent the IRS from garnishing the funds to satisfy its tax debt. Tr. VI at 1322–24; Tr. VIII at 1723 and 1810.

**89.** The 1957 Ford Thunderbird is not included in this calculation because of lack of proof regarding its eventual sale. The 1970 Corvette Convertible is also not included in the calculation because it was owned by Tommy and not by Warmus, AWSC, or Promotion Programs.

**90.** Calculated as follows: 1988 BMW—$27,075; 1988 Corvette Anniversary—$23,000; 1982 ERA Cobra—$45,400; 1972 MG Lotus—$15,000; and 1987 Ferrari Testarossa—$68,400.

**91.** Calculated as follows: 1982 ERA Cobra—$45,400; and 1972 MG Lotus—$15,000. Kathleen has already returned the money she received, plus interest, to be held in escrow pending this court's determination of potential liability and damages. Kathleen therefore has no further liability except for the loss of the escrowed funds. However, when the escrowed funds are paid to the Trustees, Dailey's joint liability regarding the 1982 ERA Cobra and the 1972 MG Lotus shall also be satisfied. *See* discussion in Part V.F.5. *infra.*

**92.** Although Dailey received $68,400 from the sale of the Ferrari Testarossa, Muir was only transferred $66,300 of those proceeds.

**93.** Warmus' testimony is that the Boat was purchased in 1986. However, later documents list the Boat as a "1988 Wellcraft". See, e.g., Exhs. B and C. The year of the Boat is of minimum importance in this opinion although it may be of greater importance when the Boat is eventually sold.

000 with Ocean Harbor Marine, Inc. in Pompano Beach, Florida.[94] Warmus continued to keep the Boat at Dailey's and his residence in Florida. Tr. VI at 1299; Tr. VIII at 1846. Touchdown did not pay any dock rent and Cheek continued to live in Michigan. Tr. VI at 1300. Warmus, as always, had the key to the Boat and could use it when he pleased. Cheek was happy to have Warmus dock and "exercise" Touchdown's Boat. Tr. VII at 1630.[95]

The court finds, at the time the Boat was transferred to Touchdown by Promotion Programs, through Warmus and Cheek, the value of the Boat was $50,000. Exh. G. The sale from Promotion Programs to Touchdown was not an arms-length transaction. Touchdown did not take transfer of the Boat "for value and in good faith" within the meaning of § 548(c) of the Bankruptcy Code. Any money that may have been paid by Touchdown, Cheek, Dailey or Warmus to market, maintain, or dock the Boat is not entitled to any lien or offset against the Boat's value under § 550(e) of the Bankruptcy Code because those persons are not "good faith transferees."

### 4. The Plane.

In 1987, Warmus arranged for the purchase of a 1986, single-engine, Maule Model M–7–235 airplane, FAA registration no. N700AW (the "Plane").[96] The Trustees contend that the Plane is property of one of the estates. Tommy asserts that he owns the Plane.

At the time the Plane was purchased, Tommy was 17 or 18 years old. Tommy was not involved in the negotiations leading up to the purchase. Exh. 44 at 138–39; Tr. VI at 1260. Tommy cannot identify who actually

paid for the Plane, or the source of the funds used to purchase the Plane. He testified, vaguely, that he believed it was purchased by some type of "child's trust", although he does not know the trustee or trustees, or the source of any trust corpus. Tommy failed to offer any documents to support the existence of a trust.

Dailey testified that "we took money out of PR/PS and paid for the Maule." Tr. VIII at 1850. According to Dailey, "the accountants had set up things, through a corporation," i.e., PR/PS, to pay expenses related to Warmus' children, including Tommy. Id. at 1854.[97] At various stages in the proceedings, Warmus gave several explanations regarding the acquisition of the Plane. At trial, he testified that Dailey, in her capacity as the "check-signing person" at PR/PS, wrote a check on the corporate account to purchase the Plane, somehow mysteriously bringing the transaction under the Uniform Gift to Minors Act ("UGMA"). Tr. VI at 1260–61. Warmus, however, admitted that he did not handle the PR/PS records, and he never saw the check allegedly used to purchase the Plane. He speculated that the check might not have been drawn on a PR/PS account, and further conjectured that it could have been drawn on Tommy's money market account. Tr. VII at 1471–72. No UGMA documents were admitted into evidence. It is easy to find that Warmus is unable to identify the source of the funds that purchased the Plane.

Immediately after its purchase, the Plane was kept at Oxbow Lake near Detroit, Michigan. Tommy could not remember who owned the property where the Plane was then kept. See Exh. 44 at 131. Within a

---

94. Cheek stated that, in June 1996, he had an offer to buy the Boat for $46,000 but he turned it down because he thought the Boat was worth more. Tr. VII at 1628–29.

95. Per Judge Ray's prior court order, Feltman is now storing the Boat at the Mull Lake Marina pending a decision of this court. Tr. II at 279.

96. Exhibit I confirms that the Plane was registered with the FAA, but as explained later, Exh. I is not evidence of ownership.

97. Dailey later testified that Investment Lease Corp. of Delaware owned the Plane, but after her attorney asked her a leading question on cross-examination, she testified that Tommy always owned the Plane. Compare Tr. VIII at 1877 with Id. at 1885–86. As stated earlier, Dailey's testimony is generally unreliable. Even if the court were to credit the self-serving and undocumented testimony of Dailey, and even assuming that Tommy owned shares in PR/PS, see Exh. X, at most Dailey's testimony suggests that PR/PS, rather than Tommy, may have purchased the Plane.

short time after its acquisition, the Plane was moved to a hanger owned by Warmus at the Oakland County Airport, also near Detroit. *Id.* at 141.

Fewer than six months after the Plane was purchased, Tommy left the Detroit area to attend college, first at the University of Arizona, and later at Michigan State University in East Lansing, Michigan. He did not take the Plane with him to Arizona or to East Lansing. *Id.* at 144. Indeed, from approximately the summer of 1987 until mid–1996, the Plane remained either at Warmus' hanger at the Oakland County Airport, or at Warmus' and Dailey's resort property in Bellaire, Michigan. *Id.* at 153. Tommy seldom used the Plane. Warmus, in contrast, admittedly used it *"regularly* to fly our clients around, take them up to Mackinaw Island, and the northern part of Michigan, which is beautiful in the summertime." Tr. VI at 1269 (emphasis added). Warmus further testified that "a company pilot" was also allowed to fly the Plane. *Id.*

In mid–1996, Ken Yott, whom Tommy described as "a mechanic", and Warmus described as a "mutual friend", flew the Plane from Michigan to Florida, where it remains today. Tommy did not ask Yott to fly the Plane from Michigan to Florida (where Warmus and Dailey then resided), nor did he pay Yott's expenses relating to the transportation of the Plane. Exh. 44 at 157. Warmus admitted that Warmus was involved in the decision to move the Plane to Florida, but suggested that Tommy was consulted, thereby contradicting Tommy's testimony. The court believes Tommy's testimony that he was not involved in the decision to move the Plane from Michigan to Florida. Weighing the evidence, the court finds that although Tommy has occasionally flown the Plane with Warmus, the Plane was almost exclusively within the possession and control of Warmus, in either his individual or AWSC corporate capacity, from the date of purchase until it was seized by the Trustees in 1996 pursuant to a court order. *See* Exhs. 2, 3, and 4.

Tommy did not pay any of the expenses associated with the Plane, such as hangar rent, fuel, insurance, or maintenance costs, although such expenses had to have been paid by someone. Warmus stated that when his company used the Plane to take clients out sightseeing, for example, "we would bill the corporation" for the expenses. Tr. VI at 1270–71. The record is absent of any documentary evidence of such invoicing and Tommy was not aware of any rental arrangements. Warmus stated that Tommy "would not have had any reason to know of what was done in that fashion [with respect to corporate payment of expenses of the Plane] because [Tommy] didn't know who flew the Plane, what was being done with it when we flew customers around in it." Tr. VI at 1271. Without credible evidence of such invoicing, the court must infer that Warmus or his corporations regularly and directly paid for all the operating expenses of the Plane.

The insurance documents also mandate a conclusion that Warmus controlled the Plane. Although some of the postpetition insurance documents admitted into evidence may lead one to believe that Tommy was the insured, other documents state that Warmus and Dailey, or a corporation or corporations listed as "Investment Lease Company dba T.A. Warmus" or "Investment Lease Corp. of Delaware," were responsible for insuring the Plane.[98] *Compare* Exh. K *with* Exh. 56A and 56B. AWSC was also listed as an additional insured. Tr. VI at 1505. For some inexplicable reason, Muir's corporation was also listed as an insured party. Warmus asserted that he was an expert on aviation insurance, and therefore personally reviewed the insurance coverage regarding the Plane. Tr. VII at 1493–94. He also "instructed the staff at our office to save hundreds of dollars" by canceling the insurance on the Plane. Tr. VII at 1481. Warmus' testimony establishes his control over the insurance matters, and demonstrates his and his companies' interest in the Plane.[99] The insur-

---

**98.** Investment Lease Company was a trade name that Warmus and Dailey used. Tr. VII at 1548. Muir supposedly owned Investment Lease Corp. of Delaware, but Dailey did not know where

Muir got the funds to capitalize the corporation. Tr. VIII at 1877; Tr. VII at 1478.

**99.** Tommy testified that he did not know who paid for insurance on the Plane, though he knew

ance was procured and paid for by Warmus or one or more of his companies. Warmus was the named pilot on the Plane. Tr. VII at 1506.

The trustees also introduced into evidence a combined financial statement showing that Warmus and Dailey owned the Plane. *See* Exh. 46. Although Warmus once again asserted another document was prepared in error, he did not introduce any other document to the contrary. Because the court believes documents more than Warmus' testimony, Exh. 46 is uncontradicted.

The combined testimony of Warmus, Dailey, and Tommy, largely unsupported by any documents whatsoever, results in a creative mish-mash of asserted facts and speculation. Notwithstanding their deliberate confusion of the issues, the court finds, after consideration of all the evidence, that Warmus controlled and *legally* owned the Plane, and Tommy did not.[100]

## V. DISCUSSION AND LEGAL CONCLUSIONS

A. *Burden of Proof in Avoidance Actions Under §§ 548 & 549.*

■ The parties have not addressed the applicable burden of proof, but the court determines that the Trustees bear the burden of proving each element of their fraudulent transfer claims by a preponderance of the evidence. *See Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.),* 124 B.R. 398, 400 (Bankr.S.D.Fla.1991); *cf. Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (preponderance of the evidence standard presumptively applies in civil actions between private litigants); *Kapi-*

la v. Plave (In re Paul), 217 B.R. 336, 337 n. 2 (S.D.Fla.1997) ("The correct standard by which to judge whether a transfer is fraudulent under Florida law is the preponderance of the evidence standard."). Notwithstanding authority in this district for imposing a heightened standard of proof under § 548,[101] this court believes that, in light of *Grogan,* which establishes a presumption in favor of a "roughly equal allocation of the risk of error between litigants," the preponderance of the evidence standard applies. *Cf. Alofs Mfg. Co. v. Toyota Mfg., Kentucky, Inc. (In re Alofs Mfg. Co.),* 209 B.R. 83, 91 (Bankr. W.D.Mich.1997) (applying preponderance of the evidence standard in turnover proceeding under § 542 in light of *Grogan* ). As a general proposition, the court can discern no "particularly important individual interests or rights" of a transferee in a fraudulent conveyance action that would justify a heightened standard of proof. *Grogan,* 498 U.S. at 286, 111 S.Ct. at 659 (citations omitted).

■ To the extent that the Trustees are seeking avoidance of postpetition transfers, the Defendants have the burden of proving the validity of the transfer. *See* FED. R.BANKR.P. 6001 ("Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof.").

■ Finally, the Defendants, as transferees, have the burden of proving elements of value, good faith, and lack of knowledge in support of any good faith defense they may assert under §§ 548(c) or 550(b) or (e). *See Kapila v. Funding, Inc. (In re Data Lease Fin. Corp.),* 176 B.R. 285, 287 (Bankr. S.D.Fla.1994) (transferee bears burden of

---

it was insured. Tr. III at 494. If he had paid the insurance premiums on the Plane, he should have recalled that fact. Acknowledging that he did not know who paid the insurance was another of Tommy's declarations against interest. Warmus also acknowledged that Tommy was not listed as a pilot on the insurance information that was submitted and personally reviewed by Warmus. Tr. VII at 1495–96. Warmus stated he had no documents that showed Tommy paid for insurance. Tr. VII at 1558.

100. Even if AWSC owned the Plane, given the confirmation of the Debtors' joint plan of liqui-

dation and Judge Ray's order approving the Trustees' agreement to divide all assets and recoveries between the Warmus and AWSC estates, the ultimate economic effect would be the same. Feltman testified that all recoveries would be split "50–50" between the estates' liquidating trusts. See Tr. I at 183–84; *see also* Order Approving Trustees' Joint Motion for Approval of Settlement Agreement Between Estates.

101. *See Bumgardner v. Ross (In re Ste. Jan–Marie, Inc.),* 151 B.R. 984, 987 (Bankr.S.D.Fla.1993).

proof under § 550(b)); *Govaert v. B.R.E. Holding Co., Inc. (In re Blitstein)*, 105 B.R. 133, 137 (Bankr.S.D.Fla.1989) (transferee has burden of proving good faith under § 550(e)); *Gennet v. BGNX, Inc. (In re BGNX, Inc.)*, 75 B.R. 44, 45 (Bankr.S.D.Fla.1987) (transferee has burden of proof under 548(c)).

## B. *Substantive Consolidation.*

Defendants, in their post-trial memoranda, take aim at the Trustees' standing, arguing that "American Way has no right to claim any interest in the assets of Promotion Programs as a result of the substantive consolidation, at least insofar as this adversary is concerned," because Judge Ray's order substantively consolidating the Promotion Programs and AWSC estates was not signed until July 17, 1997. *See* Closing Argument and Incorporated Memorandum of Law at 3. Defendants also seem to argue that the transfers were not within the one year period prescribed in § 548 because the substantive consolidation should not be given *nunc pro tunc* effect. Because the Defendants' arguments are premised to a large degree upon the effect of Judge Ray's Consolidation Order,[102] the court will address the issue at the outset, and at some length.

■ By way of background, the Eleventh Circuit has explained that substantive consolidation "involves the pooling of the assets and liabilities of two or more related entities; the liabilities of the entities involved are then satisfied from the common pool of assets created by consolidation." *Eastgroup Properties v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245, 248 (11th Cir.1991). In addition, the consolidation of the estates eliminates inter-corporate liabilities. *Id.* Although courts have been reluctant to order substantive consolidation,

there is, however, a "modern" or "liberal" trend toward allowing substantive consolidation, which has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business purposes.

*Eastgroup Properties*, 935 F.2d at 248–49. Indeed, the AWSC "group of companies" epitomizes the "interrelated corporate structure" that the Eleventh Circuit referred to in *Eastgroup Properties*.

■ A review of the consolidation orders convinces this judge that Judge Ray, in addition to consolidating the estates, intended that the consolidation would have *nunc pro tunc* effect. The court draws this conclusion from Judge Ray's finding that AWSC and Promotion Programs were alter-egos, from his express acknowledgment of the pendency of the above-captioned adversary proceedings, and his determination to "treat the Promotion Programs, Inc. Estate as a part of the American Way Service Corporation Estate *for all purposes.*" *See* Consolidation Order at ¶ 15 (emphasis added); *see also Kroh Bros. Dev. Co. v. Kroh Bros. Mgmt. Co. (In re Kroh Bros. Dev. Co.)*, 117 B.R. 499 (W.D.Mo.1989) (approving *nunc pro tunc* consolidation to permit trustee to avoid fraudulent conveyances).

Nevertheless, Defendants contend that Judge Ray did not undertake the "additional and slightly different balancing process" regarding retroactivity of the Consolidation Order that is required by the D.C. Circuit's decision in *Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp., Inc.)*, 810 F.2d 270, 276 (D.C.Cir.1987). *See* Closing Argument and Incorporated Memorandum of Law at 3–4 (citing *Auto–Train* decision and arguing

---

**102.** Even without the substantive consolidation, Judge Ray cured any potential defect that might have resulted from AWSC's claiming a direct interest in the assets when he (1) permitted Promotion Programs to intervene as a plaintiff in this action, and (2) approved the settlement agreement between the AWSC and Warmus estates pursuant to which the two estates agreed to share equally in the proceeds of this litigation. *See supra* at 502 n. 8 & 525 n. 100. Nor can the Defendants claim surprise or prejudice as a re-

sult of treating Promotion Programs and AWSC as alter-egos: Judge Ray's order of December 19, 1996, denying the Defendants' motion to dismiss the amended complaint, recites that "[t]he Defendants confirmed to the Court they do not dispute that Promotion Programs, Inc. *is and has been* the alter ego of American Way Service Corporation." *See* Order Denying Motion to Dismiss Amended Adversary Complaint at ¶ 3 (emphasis added) [C.P. 149 in the first action].

that the Eleventh Circuit has adopted the *nunc pro tunc* analysis contained therein).

▉ Assuming, however, for the sake of argument, that Judge Ray did not consider whether the consolidation order would have retroactive effect, and thus that the question is still an open one, the court may nevertheless decide the issue in the context of these adversary proceedings. *See Saccurato v. Shawmut Bank, N.A. (In re Mars Stores, Inc.),* 150 B.R. 869, 880 (Bankr.D.Mass.1993) (finding no "procedural bar in either the rules or the cases" to deciding the *nunc pro tunc* effect of consolidation in a separate adversary proceeding brought to avoid transfer as preferential and fraudulent conveyance).

▉ The separate inquiry set forth in *Auto–Train* requires the court to find that "the use of *nunc pro tunc* yields benefits greater than the harm it inflicts." *In re Auto–Train Corp., Inc.,* 810 F.2d at 277. After the proponent of retroactive consolidation shows that it is necessary to achieve some benefit or avoid some harm, the defendant "may challenge the *nunc pro tunc* entry of the consolidation order by establishing that it relied on the separate credit of one of the entities to be consolidated and that it will be harmed by the shift in filing dates." *Id.* In a case such as the present, where the assets of the respective estates have been commingled prior to bankruptcy, and where pre-bankruptcy record-keeping makes it extremely difficult to identify precisely which assets belong to which entities, *nunc pro tunc* consolidation obviously relieves the estate of the expense of reconstructing title histories. *See* Consolidation Order at ¶ 10 (noting that assets were used "interchangeably" and crediting Trustees' testimony that corporate records are "incomplete and in some cases entirely missing"). The *nunc pro tunc* consolidation avoids needless litigation over matters which, given the alter ego relationship between the debtors, are really collateral to the merits. In short, retroactive consolidation permits the representatives of the respective estates to rely on the Code's avoidance powers with a minimum of procedural wrangling. *See In re Kroh Bros. Dev. Co.,* 117 B.R. at 502 ("*Nunc pro tunc* consoli-

dation would make it possible for a trustee to pursue an action under §§ 547 and 548, so the first requirement, benefit to the estate, is satisfied.").

In order to overcome these benefits, Defendants were required to show that they (1) relied on the separate credit of one of the debtors, and (2) that they will be harmed by the shift in filing dates. Defendants did not, and could not, make these showings. First, the evidence at trial conclusively established no reliance whatsoever on the "separate credit" of Promotion Programs. Promotion Programs was not, in the words of the D.C. Circuit, an "apparently distinct affiliate." *In re Auto–Train Corp.,* 810 F.2d at 276; *see also* Order Denying Motion to Dismiss Amended Adversary Complaint at ¶ 3 (finding that defendants confirmed to court that Promotion Programs "is and has been" the alter ego of AWSC) [C.P. 149 in Adv. No. 96-0896]. Indeed, as Judge Ray found, AWSC and Promotion Programs were generally regarded as "the American Way group of companies." *See* Consolidation Order at ¶ 8. Dee, for example, did not know (and did not care) whether he was "purchasing" the cars from AWSC, Promotion Programs, or some other entity: he was just doing "a favor" for Warmus. Tr. VIII at 1950–51, 1976 & 2011. The facts at trial established that the "American Way group of companies" was a "key person operation," in which all relevant financial decisions and allocation of property were handled by Warmus. *See In re Bonham,* 226 B.R. 56, 101 (Bankr.D.Alaska 1998) (ordering *nunc pro tunc* consolidation after finding "no realistic reliance" on the credit of either of debtor's alter egos). Nor were the Defendants harmed by the shift in filing dates, given that the transfers would nevertheless be avoidable under state fraudulent conveyance law, which has longer limitation periods. *See* Fla.Stat.Ann. § 726.110(1) (four year limitation period); *see also Govaert v. Piche (In re Piche),* 55 B.R. 339, 340 (Bankr. S.D.Fla.1985) (noting that predecessor to Fla.Stat.Ann. § 726.105(1)(a) differs from § 548(a)(1) "only in that the latter is restricted to transfers which occurred within one year before bankruptcy"); *Borock v. Telesz (In re Ventimiglia),* 198 B.R. 205, 210

(Bankr.E.D.Mich.1996) (stating that § 548 and Michigan's Uniform Fraudulent Conveyance Act are similar, but Michigan's fraudulent conveyance law is "applicable to transfers made within the six years preceding the date an action is brought to avoid them"). The earliest transfers in this case occurred in August, 1994, and the Trustees commenced these consolidated adversary proceedings in 1996, well within the four year period prescribed by Florida law, or the six year period prescribed by Michigan law. Also, Promotion Programs was joined as a plaintiff within this state-mandated period as well.[103] For these reasons, the AWSC and Promotion Programs estate were substantially consolidated *nunc pro tunc*.

### C. 11 U.S.C. § 548.

For centuries, English and American courts have wrestled with recalcitrant debtors who collusively transfer assets to friends or relatives for little or no consideration, in an effort to put their property beyond the reach of creditors. *Goveart v. Capital Bank (In re Miami General Hosp., Inc.)*, 124 B.R. 383, 390 (Bankr.S.D.Fla.1991). In Elizabethan England, for example, debtors would make such conveyances, retreat into designated sanctuaries or precincts where the King's writ could not reach,[104] and wait for their creditors to abandon or compromise their claims. Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand.L.Rev. 829, 829 (1985). Warmus apparently harbored a similar design. Although transfers such as those established at trial have antecedents reaching back to Renaissance England, the law provides remedies equally-rooted in tradition.[105] The court now considers the application of these remedies to its findings of fact.

The Trustees rely primarily upon § 548(a), which provides, in relevant part, as follows:

The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ... indebted; or

(2) (A) received less than a reasonably equivalent value in exchange for such transfer ... and

(B) (i) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer....

§ 548(a). Thus, with respect to the cars and Boat allegedly transferred to defraud creditors, the Trustees must establish that (1) the property transferred belonged to one of the Debtors (either Warmus, AWSC, or Promotion Programs); (2) the transfer took

---

**103.** Although this court is not persuaded by *Auto–Train*, having undertaken the "additional and slightly difference balancing process" set forth in *Auto–Train*, the court need not decide whether the Eleventh Circuit would follow the D.C. Circuit's approach to *nunc pro tunc* consolidation, or whether the it would adopt some alternative. *Compare First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Serv., Inc.)*, 974 F.2d 712, 721 (6th Cir.1992) (automatically applying earliest filing date) *with Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp., Inc.)*, 810 F.2d 270, 276 (D.C.Cir.1987) (requiring separate inquiry). Regardless of the proper procedure or standard, the result is the same.

**104.** These Elizabethan sanctuaries arguably have a modern analog in Florida, given the State's virtually unlimited homestead exemption. *See* Richard Blackstone Webber, II, *Florida's Homestead Exemption in the Eye of the Hurricane*, 71 Fla.Bar J. 60, 60 (April 1997) ("Florida has long been regarded as a 'debtor's haven' in large part due to Florida's generous homestead exemption."); Fla. Const. art. X, § 4 (homestead exemption).

**105.** In 1570, in response to such abuses, Parliament enacted legislation known as the "Statute of 13 Elizabeth," which invalidated "'covetous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others.'" *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994) (*quoting* 13 Eliz., ch. 5 (1570)). Every American jurisdiction, either by common law or statute, has similarly condemned transfers made to "hinder, delay, or defraud" creditors. *See* UNIFORM FRAUDULENT TRANSFER ACT (Prefatory Note), 7A U.L.A. 639, 639 (1985). Indeed, "[e]very American bankruptcy law has incorporated a fraudulent transfer provision...." *BFP*, 511 U.S. at 541, 114 S.Ct. at 1763. The Statute of 13 Elizabeth finds a modern expression in section 548(a).

place on or within one year before the filing of the petitions; and (3) the transfers were tainted by either actual or constructive fraud.

There is no dispute that the property at issue was transferred. Moreover, because the court has found, as a matter of fact, that all of the property [106] belonged either to Warmus, or Promotion Programs, or AWSC, the Trustees have established that one of the Debtors had an interest in the property. With one exception,[107] all transfers at issue occurred within one year before the filing of the petition in the Warmus case, and the AWSC and Promotion Programs cases. The court must next consider whether each transfer was actually or constructively fraudulent.

Because direct evidence of actual intent is usually difficult to uncover, courts have traditionally relied upon so-called "badges of fraud" as circumstantial evidence of actual intent. *See Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262 (11th Cir.1998). In *XYZ Options*, the Eleventh Circuit held that "in determining whether the circumstantial evidence is sufficient to establish fraudulent intent, the court should investigate the transfer for the existence of badges of fraud." *Id.*, 154 F.3d at 1271. Under § 548(a)(1), the court must consider whether:

(1) The transfer was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer was disclosed or concealed;

(4) Before the transfer was made the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*In re XYZ Options, Inc.*, 154 F.3d at 1271–72. The Eleventh Circuit noted that, "[a]lthough the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the 'confluence of several can constitute conclusive evidence of an actual intent to defraud.'" *Id.*, 154 F.3d at 1271 n. 17 (*citing Brown v. Third National Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th Cir.1995), *and Kleinfeld v. Sun Land Properties, Inc. (In re Kranich)*, 53 B.R. 821, 823 (Bankr.M.D.Fla. 1985)).

D. *State Law.*

Although the Trustees' pleadings and closing briefs do not specifically refer to Florida's version of the Uniform Fraudulent Transfer Act ("UFTA")[108] or Michigan's version of the Uniform Fraudulent Conveyance Act ("UFCA"),[109] they have invoked § 544, which permits them to avoid certain transfers under applicable state law.[110]

---

**106.** Except for the 1970 Corvette Convertible which was owned by Tommy. *See supra* at Part IV.C.2.c.

**107.** The Boat was transferred postpetition.

**108.** Fla.Stat.Ann. § 726.101 *et seq.*

**109.** Mich.Comp.Laws Ann. § 566.11 *et seq.*

**110.** *See* § 544(b). Even without this citation, however, the court has the "responsibility to award relief required by the facts on any proper ground, regardless of the theories urged by the parties." *Industrial Dev. Bd. v. Fuqua Indus.,*

*Inc.*, 523 F.2d 1226, 1240 (5th Cir.1975) (quoting *Massachusetts Bonding and Ins. Co. v. New York*, 259 F.2d 33 (2d Cir.1958)); *see also United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (when issue or claim is properly before the court, court is not limited to particular legal theories advanced by parties); *see also* FED.R.CIV.P. 15 & 54. At trial, the parties acknowledged that the court would consider state law avoidance remedies. The facts established at trial certainly warrant relief in favor of the Trustees under state fraudulent conveyance law. Indeed, the Trustees proved their case by clear and convincing evidence.

Courts applying these laws, like courts applying section 548(a)(1), rely on the badges of fraud as circumstantial evidence of fraudulent intent. *See United States v. Rode*, 749 F.Supp. 1483, 1493 (W.D.Mich.1990) (indicia of fraud under UFTA), *aff'd*, 943 F.2d 53 (6th Cir.1991) (table); Fla.Stat.Ann. § 726.105(2) (non-exclusive list of factors to be considered in determining actual intent under UFTA).[111] Because the Trustees have established actual intent to defraud the creditors of AWSC, these state laws, which are nearly identical to section 548(a)(1), provide additional grounds for avoidance under the facts and circumstances of this case. *Compare* § 548(a)(1) (permitting avoidance of transfers made "with actual intent to hinder, delay or defraud any entity") *with* Fla. Stat.Ann. § 726.105(1)(a) (transfers made "[w]ith actual intent to hinder, delay, or defraud any creditor" are fraudulent) *and* Mich.Comp.Laws Ann. § 566.17 ("Every conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud ... creditors, is fraudulent...."). The similarity of these statutes, at least insofar as actual intent to defraud is concerned, and the clear and convincing proof of actual fraud,[112] avoids any potential conflict of law.

**E.   *11 U.S.C. § 549.***

▮▮▮   To the extent that the transfers involved in this litigation occurred postpetition, or are deemed to have occurred postpetition, the Trustees invoke section 549, which provides in relevant part as follows:

(a)  Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2) (A) that is authorized only under section 303(f) or 542(c) of this title;  or

(B) that is not authorized under this title or by the court.

§ 549(a). As applicable herein,[113] "the criteria for avoidance are (1) a transfer; (2) of property of the estate; (3) which occurred postpetition; and (4) was not authorized by the Bankruptcy Code or the court." *Manuel v. Allen (In re Allen)*, 217 B.R. 952, 955 (Bankr. M.D.Fla.1998). A transferee may establish that a transfer is authorized by proffering a court order, or by bringing the transaction within one of the postpetition transactions specifically authorized by the Code, such as a sale of property in the ordinary course of business. *See, e.g.*, § 363(c)(1).

**F.   *Transferee Liability Under 11 U.S.C. § 550.***

▮▮▮   The court must now consider what relief is appropriate under the circumstances, keeping in mind the remedial purpose of the applicable statute. Specifically, the Bankruptcy Code provides, in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made;  or

(2) any immediate or mediate transferee of such initial transferee.

.     .     .     .     .

(d) The trustee is entitled to only a single satisfaction under subsection (a) of this section.

§ 550.  The purpose of section 550 is "to restore the estate to the financial condition it

---

**111.**  The "badges of fraud" that the Eleventh Circuit considered in *XYZ Options* are the same "factors" listed in Florida's version of the UFTA. *Compare In re XYZ Options, Inc.*, 154 F.3d at 1271–72 *with* Fla.Stat.Ann. § 726.105(2).

**112.**  Michigan's version of the UFTA requires proof of actual intent by clear and convincing evidence. *See United States v. Rode*, 749 F.Supp. at 1493. The Trustees, although not required to

meet this burden of proof under federal or Florida law, have nevertheless done so. The proof of fraudulent intent is overwhelming.

**113.**  Because the exceptions referred to in subsection (a) and contained in subsections (b) and (c) apply to involuntary cases and transfers of real property, respectively, they are not applicable in the present litigation.

would have enjoyed if the transfer had not occurred." *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y.1998) (*citing Morris v. Kansas Drywall Supply Company, Inc. (In re Classic Drywall, Inc.)*, 127 B.R. 874, 876 (D.Kan. 1991)); *Aero–Fastener, Inc. v. Sierracin Corp. (In re Aero–Fastener, Inc.)*, 177 B.R. 120, 139 (Bankr.D.Mass.1994).

▮ If the value of the property has declined following the fraudulent transfer, returning the devalued property itself would not make the estate whole. In such instances, the courts have awarded a money judgment. *In re Classic Drywall*, 127 B.R. at 877; *Ferrari v. Computer Assoc. Int'l, Inc. (In re First Software Corp.)*, 84 B.R. 278 (Bankr.D.Mass.1988), *aff'd*, 107 B.R. 417 (D.Mass.1989). On the other hand, when the property has appreciated, the trustee is entitled to recover the property itself, or the value of the property at the time of judgment. *See In re Blitstein*, 105 B.R. at 137.[114] The statute, in prescribing alternatives, is purposefully flexible to accomplish its remedial goal.

In order for the court to decide whether to award the property itself, or a money judgment, however, the court must compare the value of the property at the time of conveyance with the value at the time of judgment to determine whether the property has appreciated or depreciated in the interim. In this opinion, the court has determined the value of the property at the time the conveyances took place, but the record is bare with respect to the value of the property at the present time.[115]

▮ Although the cases construing section 550(a) contain language which may suggest that the alternatives set forth in the statute are mutually exclusive, *i.e.*, that the court cannot order both the return of property *and* a money judgment,[116] such a possible reading is inconsistent with the language of the Code. Section 550(a) does *not* provide mutually exclusive alternatives. Rather, the Code permits the court, in its discretion, to award *both* a money judgment *and* recovery of the property in kind, provided that the Trustees are limited to a single satisfaction. *See* § 550(d). This conclusion follows from Congress' use of the word "or" where it first appears in section 550(a), and the Code's explicit rule of construction which provides that the word " 'or' is not exclusive." § 102(5). The legislative history sheds light on this rule of construction:

> if a party "may do (a) or (b)", then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 315–316 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 27–28 (1978). Thus, because the court may direct the return of the property *or* impose a money judgment under § 550(a), it follows that the court may do both, provided, of course, that the Trustees do not obtain a multiple recovery. *See* § 102(5); § 550(a) & (d).

Interpreting section 550 as providing mutually exclusive alternatives also creates a problem when a court cannot determine whether the property has appreciated or depreciated following the fraudulent convey-

114. In the case of appreciation of property resulting from the transferee's improvement of the property, the statute provides that the transferee is entitled to recover appreciated value, but only if the transferee took the property in good faith. *See* § 550(e); *In re Blitstein*, 105 B.R. at 137. Given that Congress has specifically stated the circumstances in which a transferee is entitled to recover the appreciated value, i.e., only in cases in which a good faith transferee made improvements as defined, and given that the aim of the statute is to "make the estate whole," it follows that the transferee is not entitled to retain any appreciated value, other than as provided in section 550(e).

115. Some of the property has been stored and not yet sold. The amount of the Trustees' future recovery cannot be determined in advance.

116. *See, e.g., In re Centennial Textiles, Inc.*, 220 B.R. at 176–77 ("since the Bankruptcy Code does not provide guidance on when the Court should order payment of the value of property rather than order the return of property itself, it is within the Court's discretion to make such a determination"); *Kelley v. General Motors Acceptance Corp. (In re Farmer)*, 209 B.R. 1022, 1024 (Bankr.M.D.Ga.1997) ("The Bankruptcy Code provides little guidance as to which of these section 550(a) remedies is more appropriate in a particular circumstance.").

ance. For example, if the court awards a money judgment, but the property has appreciated, the judgment will not restore the estate to the condition that it would have been in but for the transfer: the transferee will retain the appreciated value. This is contrary to section 550(e), which specifies the narrow circumstances in which the transferee is entitled to share in the appreciated value. On the other hand, if the court limits the Trustees to recovery of the property itself, and if the property has declined in value, the estate will have lost the opportunity to dispose of the property prior to its depreciation. In such a case, too, the judgment will not, as a practical matter, restore the estate to the condition that it would have been in but for the transfer.

In appropriate instances, awarding a money judgment *and* the property in kind has an added practical benefit. If the court awarded only a money judgment, but not the property in kind, the property in storage, subject to this litigation, would be awarded to the transferee-Defendants. In the process of collecting their money judgment, however, the Trustees would be entitled (and probably required) to execute upon the Defendants' property, including the property that had been fraudulently transferred. It simply makes no sense to award the Trustees a money judgment, but direct them to return the property to the transferee-Defendant so that the Trustees can levy on that property. Moreover, returning the property to any Defendant-transferee would create an opportunity for Warmus and that Defendant to thwart justice by again transferring the

property to others. By awarding the Trustees a money judgment *and* the property in kind, the court is expediting the ultimate satisfaction of the money judgment, a result that is entirely consistent with the Code because it minimizes collection costs, and reduces the possibility of any further fraudulent conveyances.

■ Accordingly, the court will prepare and render judgment against each of the transferee-Defendants in an amount representing the value of the property transferred to them at the time of the conveyance. The judgment will not reflect any offset or lien on account of any value that the transferees may have given in exchange for the respective transfers because the transferees did not meet their burden of establishing "good faith" under § 548(c) or § 550(b) or (e). *See supra* at Part V.A. (burden of proof).[117] Indeed, in its findings of fact, the court has explicitly determined that no transfers were arms-length and none of the transferees received the property in good faith.[118] *See supra* at Part IV.C.1.–3. Any of the Defendants who gave value to the Debtors in exchange for the transfers may look to the ordinary claims process in the main bankruptcy case for satisfaction of their unsecured claims. *See* WILLIAM L. NORTON, JR., 3 NORTON BANKRUPTCY LAW AND PRACTICE 2D § 58:8 (transferee for value who does not take in good faith receives only an unsecured claim against the estate, subject to § 502(h)).[119]

■ In addition to relief in the form of damages, the court's judgment will entitle

---

**117.** The defense provided under section 548(c) is available only to a transferee who "takes for value *and* in good faith." § 548(c) (emphasis added).

**118.** A transaction is not made in good faith if the earmarks of an arms-length transaction are missing or if the transferees are "privy" to the fraudulent purpose of the transfers. *See Torcise v. Community Bank of Homestead (In re Torcise),* 116 F.3d 860, 868 (11th Cir.1997) *(citing Consove v. Cohen (In re Roco Corp.),* 21 B.R. 429 (1st Cir. BAP 1982), *aff'd,* 701 F.2d 978 (1st Cir. 1983), *and Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1256 n. 13 (1st Cir.1991)). According to the Tenth Circuit, a majority of bankruptcy courts construing section 548(c) have determined that "a transferee who

reasonably should have known of a debtor's insolvency or of the *fraudulent intent* underlying the transfer is not entitled to the § 548(c) good faith defense." *Jobin v. McKay (In re M & L Business Machine Co.),* 84 F.3d 1330, 1336 (10th Cir.) (citations omitted and emphasis supplied), *cert. denied,* —— U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996).

**119.** Given that Judge Ray has already confirmed the reorganization plans in the base cases, filing any claim would very likely be futile. The Defendants should have returned the property prior to confirmation in order to preserve their right to file their respective claims. *Cf.* § 502(d) (claim disallowed unless liability is paid or property is returned).

the Trustees to recover from the appropriate Defendants the cars, the proceeds in escrow, and the Boat which were fraudulently transferred. *Id.* § 550(a); *see also* FED. R.BANKR.P. 7070 (Judgment for Specific Acts; Vesting Title). These items will, upon entry of the judgment, become property of the estate. § 541(a)(3). The Trustees will thereafter liquidate the property. If the sale or other disposition of the property produces a deficiency, the Trustees may seek to recover the deficiency from the appropriate transferee, in accordance with the court's judgment. If, however, the proceeds of the sale of the property (either returned to or retained by the Trustees) exceed the value of a related money judgment, the Trustees may retain the surplus, but, because already satisfied, may not execute on the judgment. *Id.* § 550(d).

## G. *Conclusions of Law Regarding Transfers of Specific Assets.*

■ Turning to the evidence presented at trial, the court concludes that the Trustees have proved a classic case of fraudulent conveyance. The specific transactions are discussed below.

### 1. *The Dee Cars.*

The transfer of the Dee cars [120] bore many of the badges of fraud enumerated by the Eleventh Circuit. *See In re XYZ Options, Inc.,* 154 F.3d at 1271–72. Dee was closely aligned with, and beholden to, Warmus because of the significant, past-due debts Dee owed to AWSC. *See supra* at Part IV.B. Moreover, Warmus and Dee concealed the true nature of the transaction from the IRS by concocting a letter on Dee's Moreno Valley dealership stationery which purported to be an arms-length offer to purchase the cars, but which in fact was the product of Dee's and Warmus' collusive arrangement. *Id.* The transfer to Dee took place after the entry of the Wynn Oil judgment, and after the IRS began enforcing its tax liens against the assets of Warmus, AWSC and Promotion Programs. *Id.;* Part IV.C.1.a.-h. Most of the proceeds of the transactions were surreptitiously routed to friendly transferees,

including insiders Dailey and Muir, and Touchdown, Lowe, and Howard—all of whom Warmus controlled by virtue of family, employment, or lending relationships. *See supra* at Part IV.B. The $86,000 that Dee ostensibly paid for the cars was not reasonably equivalent in value, which the court has found to be $336,739.60 in the aggregate. *See supra* at Part IV.C.1.h. Finally, Warmus maintained possession and control of the cars after he transferred them to Dee, and controlled the resale of the cars and distribution of proceeds. *See supra* at Part IV.B; Part IV.C.1. The confluence of these badges of fraud conclusively establishes that the transfer of the Dee cars, and the subsequent transfers of the proceeds, were made with actual intent to hinder, delay, and defraud creditors. *In re XYZ Options, Inc.,* 154 F.3d at 1271 n. 17.

Because the court has found that the transaction was not an arms-length sale, and that Dee did not participate in good faith, *see supra* at Part IV.C.1, Dee is not entitled to offset or assert a lien to recover any money that he may have paid on account of the cars. The subsequent transferees of the sale proceeds are likewise not entitled to assert any lien or offset for recovery of funds paid or advanced.

### 2. *1988 BMW 750 and 1988 Corvette.*

Similarly, the transfer of the 1988 BMW 750 and the 1988 Corvette from Promotion Programs to Dailey and Warmus are marked by the badges of fraud. The cars were conveyed to insiders in mid–1994, shortly after the entry of the Wynn Oil judgment, and while the IRS was enforcing its tax liens. *See supra* Part IV.B.; Part IV.C.2.a. The consideration that Promotion Programs supposedly received for the two cars, i.e., $23,000, was not reasonably equivalent to their value, i.e., $50,075. *See supra* Part IV.C.2.a. In addition, the transfer of the cars was not disclosed to the IRS. *Id.* The court concludes that the transfers were made with actual intent to defraud. *See In re XYZ Options, Inc.,* 154 F.3d at 1271–72.

120. *See supra* at Part IV.C.1.

As noted above, this transfer of these cars was not a *bona fide* sale, and Dailey did not participate in good faith. *See supra* at Part IV.C.2.a. Therefore, she is not entitled to offset or assert a lien to recover any money that she may have paid on account of the cars.

### 3. *1957 Ford Thunderbird.*

The Trustees failed to establish that the transfer of the 1957 Ford Thunderbird was a fraudulent conveyance. *See supra* Part IV. C.2.b.

### 4. *1970 Corvette Convertible.*

The Trustees failed to establish that the 1970 Corvette convertible was property of one of the Debtors. *See supra* Part IV.C.2.c. Accordingly, the Trustees have failed to prove that the transfer of this car was a fraudulent conveyance.

### 5. *1982 ERA Cobra Roadster.*

This transfer occurred, as did the others, in contemplation of the Wynn Oil judgment and the IRS tax liens. *See supra* Part IV.B; Part IV.C.2.d. Because the proceeds of the sale of this car were paid not to the Debtors, but instead to Dailey (an insider) and Kathleen, neither Warmus nor AWSC received reasonably equivalent value for the 1982 ERA Cobra Roadster. *Id.* These indicia of fraud, viewed in context and in light of the admissions and other evidence, establish an actual intent to hinder, delay, and defraud creditors. *See In re XYZ Options, Inc.*, 154 F.3d at 1271–72.

Because the court has already found that the transaction was not an arms-length sale, and that Dailey did not participate in good faith, *see supra* at Part IV.C.2.d, she is not entitled to offset or assert a lien to recover any money that she may have paid on account of the cars. Given the single satisfaction rule, however, Dailey's obligation to pay the portion of the judgment allocable to the 1982 ERA Cobra Roadster will be satisfied upon the payment of the escrow account (including accrued interest) which contains the funds that Kathleen deposited with Trustees' counsel pursuant to the court-approved settlement. *See* § 550(d).

### 6. *1972 MG Lotus.*

Warmus also sold the 1972 MG Lotus at the 1994 Labor Day weekend Kruse auction, after the entry of the Wynn Oil judgment and while the IRS was attempting to enforce its tax liens. *See supra* Part IV.C.2.e. Warmus did not receive reasonably equivalent value for the car, because he diverted the proceeds to his wife, Dailey, and their friend, Kathleen, both of whom he controlled. *Id.* In this way, Warmus put the car beyond the reach of his creditors, but retained control of the sale proceeds. These badges of fraud, viewed in context and in light of the admissions and other evidence, establish that this transfer, too, was actually intended to defraud creditors. *See In re XYZ Options, Inc.*, 154 F.3d at 1271–72.

As with the other fraudulent transfers, neither Dailey nor Kathleen took the property in good faith. Accordingly, they may not claim any offset or lien. However, as is true regarding the ERA Cobra, when the Trustees receive the funds held in escrow, Dailey's transferee liability regarding this specific car will be satisfied. *See* § 550(d).

### 7. *1987 Ferrari Testarossa.*

Warmus' liquidation of the 1987 Ferrari Testarossa was similarly tarnished by the badges of fraud. Like the other transfers which took place in connection with the 1994 Labor Day weekend Kruse auction, this transfer occurred shortly after the entry of the Wynn Oil judgment and while the IRS was enforcing its tax liens. *See supra* at Part IV.B; Part IV.C.2.f. The proceeds of sale went not to Warmus, but instead to his wife Dailey, and thereafter, his mother-in-law Muir—both of whom he controlled. *See supra* at Part IV.B; Part IV.C.2.f. Dailey testified that these arrangements were made to avoid the IRS lien. *See supra* at Part IV.C.2.f. In effect, therefore, Warmus maintained control over the proceeds of the car after the sale, but put the proceeds beyond the reach of his creditors. These hallmarks also establish a classic conveyance made with actual intent to hinder, delay, and defraud

creditors. *See In re XYZ Options, Inc.*, 154 F.3d at 1271–72.

Because the court has found that the transaction was not at arms-length, and that Dailey and Muir did not participate in good faith, *see supra* at Part IV.C.2.f, they are not entitled to any offset or assert a lien to recover any money that they may have paid on account of the 1987 Ferrari Testarossa.

### 8. *The Boat.*

■■■ The transfer of the Boat from Promotion Programs to Touchdown is avoidable under section 549 as an unauthorized postpetition transfer because it meets the criteria for avoidance set forth above. The evidence establishes that, prior to transferring the Boat to Touchdown, Promotion Programs owned the Boat. The record also shows that Promotion Programs transferred the Boat to Touchdown, at the earliest, on December 15, 1994. *See supra* at Part IV.B and C.3. Because Promotion Programs is deemed to have filed its petition on December 2, 1994 (given the *nunc pro tunc* effect of the consolidation of the AWSC and Promotion Programs estates), the Boat was property of the estate, and the transfer is deemed to have occurred postpetition.

Although the Bankruptcy Rules squarely place upon Touchdown the burden of proving that the transfer was authorized either by the court or the Code, Touchdown has failed to meet its burden. *See* FED.R.BANKR.P. 6001 and *supra* at Part V.A (discussing burden of proof). Nor could Touchdown establish that the transfer was authorized, for example by showing it was a sale in the ordinary course of Promotion Program's business,[121] given the following badges of fraud that mark the transfer as having been made with actual intent to delay, hinder, and defraud creditors, principally the IRS.

By creating Touchdown as a strawman and arranging for an undocumented "loan" from Dee to Touchdown, Warmus effectively concealed from the IRS the true nature of the transaction. *See supra* at Part IV.B and C.3. Moreover, although Touchdown tendered the purchase price in December, 1994, the sale

was not documented with a bill of sale until April, 1995, and was not made a matter of public record until June, 1995 when the Boat was reregistered with the State of Florida— well after Warmus and the IRS reached a settlement. *Id.* In addition, the sale price was significantly less than the substantially contemporaneous appraisal that Atlantic Yacht Brokers prepared. *See supra* at Part IV.B. and C.3. Finally, notwithstanding the sale, Warmus retained possession and control of the Boat, just as he had done before the transfer. In view of these indicia of fraud, the court easily finds that the Boat was transferred with actual intent to hinder, delay, and defraud creditors. *See In re XYZ Options, Inc.*, 154 F.3d at 1271–72. Accordingly, the transfer is avoidable as a fraudulent conveyance under §§ 548 and 544, in addition to the avoidance under § 549.

As noted above, the sale to Touchdown was not an arms-length transaction, and Touchdown did not take title in good faith. Accordingly, Touchdown is not entitled to any offset or lien to recover its costs associated with the Boat.

### H. *Ownership of the Plane.*

In addition to their fraudulent conveyance claims, the Trustees seek a judgment determining that the Plane became "property of the estate" upon the filing of the AWSC or Warmus bankruptcy petitions.

■■■ Section 541 broadly defines property of the estate to include, in relevant part, "all legal or equitable interests of the debtor in property as of the commencement of the case," regardless of where the property is located, or who holds it. *See* § 541(a)(1); *Skolnick v. Atlantic Gulf Communities Corp. (In re General Dev. Corp.)*, 179 B.R. 335, 338 (S.D.Fla.1995) (property of the estate includes all legal or equitable interests of debtor); *In re Knight*, 164 B.R. 372, 374 (Bankr. S.D.Fla.1994) (same); *In re Sielaff*, 164 B.R. 560, 565–66 (Bankr.W.D.Mich.1994) (same). The Trustees contend that either Warmus or his company, AWSC, had an equitable ownership interest in the Plane. Tommy contends that, through some unspecified trust,

---

121. *See, e.g.*, § 363(c)(1).

he purchased the Plane when he was in high school.

■■■■ In determining who is entitled to personalty, courts consider who paid for the acquisition and expenses of the property, who possessed it, and who controlled it. *See In re Sielaff,* 164 B.R. at 565–66; *Rieser v. Randolph County Bank (In re Masters),* 137 B.R. 254, 259 (Bankr.S.D.Ohio 1992); *Rutledge v. Toyota Motor Credit (In re Rutledge),* 115 B.R. 344, 345–46 (Bankr. N.D.Ala.), *aff'd,* 121 B.R. 609 (N.D.Ala.1990); *In re DesChamps,* 79 B.R. 62, 63–64 (Bankr. M.D.Fla.1987). Indeed, possession of personal property has long been regarded as *prima facie* evidence of title. *See Inman v. Rowsey,* 41 So.2d 655 (Fla.1949); *Trevorrow v. Trevorrow,* 65 Mich. 234, 31 N.W. 908 (1887) (possession of personalty is presumptive evidence of title). As stated above, the evidence at trial conclusively established Warmus' possession and control of the Plane. *See supra* Part IV.C.4.

Tommy has not rebutted the Trustees' proof of his father's possession and control. Although Tommy relies heavily on the certificate of registration issued by the Federal Aviation Administration as evidence that he owned the airplane, *see* Exh. I, his reliance is misplaced. First, as a matter of federal law, a certificate of registration "is ... *not* evidence of ownership of an aircraft in a proceeding in which ownership is or may be in issue." 49 U.S.C. § 44103(c)(2) (emphasis supplied); *Koppie v. United States,* 1 F.3d 651, 653 (7th Cir.1993) (certificate of registration is "worthless as far as proving ownership"); *Hamilton v. Moore Flying, Inc. (In re Hamilton),* 197 B.R. 305, 306 (Bankr. E.D.Ark.1996) (in turnover proceeding, court finds that "registration with the FAA is not evidence of ownership....."). Second, the certificate of registration is suspect because it appears to have been altered where it lists the name of the owner as "Thomas Alan Warmus." Third, the owner's address on the certificate is the same post office box used by AWSC. Thus, even if the certificate of registration were evidence of ownership, given all the court's findings, the document is not reliable evidence of Tommy's ownership. Tommy also failed to offer any documentary evidence of his ownership, such as a bill of sale or similar instrument.

Nor does the court credit the testimony to the effect that Tommy was the beneficiary of a trust that purchased the Plane. The other evidence of the alleged trust is similarly inadequate. Significantly, Tommy failed to offer any documentary evidence of any trust. The Articles of Incorporation of PR/PS upon which he relied do not suffice. Although it is possible Dailey may have held certain property as Tommy's custodian under UGMA, such as stock in PR/PS, *see, e.g.,* Exh. X, this fact standing alone neither compels nor permits an inference that the Plane was purchased in trust for Tommy, by PR/PS or any other entity. Because evidence of any trust would have been "peculiarly available" to Tommy as the alleged beneficiary, and because he failed to produce any evidence of a trust, the court infers that there was no such trust. *Roemelmeyer v. Vidana (In re Vidana),* 19 B.R. 787, 788 (Bankr.S.D.Fla.1982) (failure to provide evidence peculiarly available to a party supports adverse inference that the truth would be damaging to that party). Putting aside the failure to offer any meaningful documentary evidence, the testimony of Tommy, as well as that of Warmus and Dailey, was vague, inconsistent, and not credible. *United States v. Kaplan,* 277 F.2d 405, 409 (5th Cir.1960) (noting that burden of proving existence of secret and oral trust is "a heavy one," and refusing to find trust based upon testimony of beneficiary and trustee that was "ambiguous, confused, vague and in some respects contradictory to prior sworn" statements); *Harmon v.. Harmon,* 303 Mich. 513, 519, 6 N.W.2d 762, 764 (1942) (parol evidence of trust of personalty must be "very clear and satisfactory").

Accordingly, the court finds that the Trustees, by operation of section 541 and Judge Ray's orders in the main cases, have *legal* title to the Plane; Tommy has no interest in the Plane.

I. *Plaintiffs' Other Causes of Action.*

In their pleadings, the Trustees advanced several other claims, including preference claims, against various Defendants. *See* Amended Adversary Complaint for Injunc-

tive Relief, Turnover, Money Damages and Other Relief (count VI in the first action); Amended Adversary Complaint for Money Damages and Other Relief, (counts V–IX in the second action). Having failed to offer any proof to support their preference claims, the Trustees are not entitled to relief under § 547. To the extent that the Trustees sought turnover of the several cars, the Boat, and the Plane from the Defendants under § 542, the claims are mooted by the Trustees' possession of these assets and this court's determination that the Trustees are entitled to retain and sell these assets for creditors. All other claims of the Trustees, except as otherwise provided in this opinion, fail for lack of proof.

### J. Defendants' Counterclaims.

As stated, Judge Ray dismissed most of the Defendants' counterclaims before trial. *See supra* at 502–03. With respect to those that remained pending at the time of trial,[122] the Defendants failed to offer sufficient proof to support their allegations. Accordingly, the Trustees are entitled to a judgment of no cause of action with respect to all of the Defendants' counterclaims.

### K. Form of Judgment.

#### 1. Separate Judgments.

As noted above, on March 7, 1997, Judge Ray consolidated the Trustees' two adversary proceedings "for purposes of discovery and trial." *See supra* at 501. Although the proceedings were consolidated for such purposes, the two formerly separate actions do not lose their separate identity. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998) ("consolidation of cases under FED. R.CIV.P. 42 does not strip the cases of their individual identities"); *see also Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331 (1933) (decision pre-dating Federal Rules of Civil Procedure which holds that consolidated cases are not thereby merged into single action); *see generally* Gaylord A. Virden, *Consolidation Under*

*Rule 42 of the Federal Rules of Civil Procedure*, 141 F.R.D. 169 (1992) (concluding that the rule in *Johnson v. Manhattan Ry. Co.* survived the promulgation of FED.R.CIV.P. 42, and that consolidation does not effect a merger of the several cases).

Notwithstanding the foregoing, the court has the authority to "make such orders concerning proceedings therein as may tend to avoid unnecessary costs and delay." FED. R.BANKR.P. 1001 & 7042; FED.R.CIV.P. 42(a). In the present case, given the inextricable links between the facts and claims for relief in the first and second actions, and given the potential for confusion in post-judgment proceedings, the rendering of two judgments presents an unreasonable risk of precipitating unnecessary costs and delay. It also raises the possibility of duplicate recovery and multiple appeals. Accordingly, the court will render a single judgment encompassing all relief awarded in both actions.

#### 2. Summary of Relief and Transferees' Liability

The judgment to be prepared by the court requires a special explanation and attention to detail because it is not of a garden variety. Although the evidence adduced at trial established a single scheme to defraud, the scheme was accomplished through a series of discrete, initial and subsequent transfers, each involving different assets and many involving a combination of different transferees, whose liability depends upon their varying shares of the proceeds. Moreover, the statutes which create the Trustees' avoidance powers and impose transferee liability, after all, target the individual transfers, not the overall scheme. The court's judgment must reflect these considerations.

Therefore, the judgment will avoid the transfers that the court has found to be avoidable in this opinion. It will also declare that the Trustees are entitled to the Plane, the Boat, the 1979 Lamborghini, and 1979 Ferrari Boxer. In addition, the judgment will award damages against the various De-

---

**122.** The counterclaims that survived Judge Ray's dismissal order included the claims for "experience rated refunds," for indemnification under AWSC's articles of incorporation, for civil theft, restitution, and replevin. *See supra* at 502–03.

fendants under section 550, on account of the specific assets that were transferred, in the following amounts: (1) with respect to the 1935 Ford Pickup and the 1979 Porsche Turbo, judgment against Dee in the amount of $19,490; (2) with respect to the 1979 Lamborghini and 1979 Ferrari Boxer, judgment against Dee in the amount of $220,000; (3) with respect to the 1926 Ford Speedster and the 1978 Auburn Boat Tail Speedster, judgment imposing joint and several liability against Dee and Dailey in the amount of $45,260; (4) with respect to the 1988 BMW 750 and the 1988 Corvette, judgment against Dailey in the amount of $50,075; (5) with respect to the 1969 DeTomaso, judgment imposing joint and several liability against Dee and Touchdown in the amount of $39,000; (6) with respect to the 1978 Ferrari 308, judgment against Dee in the amount of $42,-999.60,. judgment against Touchdown in the amount of $16,273.20, judgment against Muir in the amount of $15,952.40, and judgment against Howard in the amount of $10,774 (said awards imposing joint and several liability to the extent of the respective Defendant's share of the proceeds); (7) with respect to the 1982 ERA Cobra Roadster and the 1972 MG Lotus, judgment imposing joint and several liability against Dailey and Kathleen in the amount of $60,400, which judgment will be satisfied when the settlement funds that Kathleen previously deposited in the Trustees' counsel's escrow account are disbursed to the Trustees; (8) with respect to the 1987 Ferrari Testarossa, judgment against Dailey in the amount of $68,400, and judgment against Muir in the amount of $66,-300 (said awards imposing joint and several liability to the extent of the respective Defendant's share of the proceeds); and (9) with respect to the Boat, judgment against Touchdown in the amount of $50,000. Finally, with respect to 1957 Ford Thunderbird and the 1970 Corvette Convertible, a judgment of no cause of action, and with respect to the Defendants' counterclaims, a judgment of no cause of action. The court will prepare and enter a separate judgment in conformity with this opinion.

### 3. *Interest.*

▮ The Trustees have not specifically requested prejudgment interest in their pleadings, although they did request such interest in their post-trial memorandum, but only with respect to the funds transferred to Kathleen. Generally, prejudgment interest is available, in the court's discretion, in fraudulent conveyance actions. *See Bakst v. Presley (In re E.D. Presley Corp. Ltd.)*, 44 B.R. 781, 784 (Bankr.S.D.Fla.1984). Because the Trustees have requested such interest only with respect to the funds returned by Kathleen and now held in escrow, however, the court will award interest only with respect to those funds, and as set forth in Judge Ray's prior Order Approving Stipulation of Settlement as to Defendant, Kathleen Lowe. *See Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte*, 141 F.3d 1434, 1447 (11th Cir.1998) (in the absence of controlling statute, federal court's choice of prejudgment interest rate is a matter of discretion), *cert. denied*, —— U.S. ——, 119 S.Ct. 797, 142 L.Ed.2d 659 (1999). Even if the Trustees had requested prejudgment interest generally, their failure to offer proof supporting an appropriate interest calculation prevented the court from exercising its discretion to award pre-judgment interest. The Trustees, of course, will be entitled to post-judgment interest as provided by law. *See* 28 U.S.C. § 1961; *Pester Refining Co. v. Ethyl Corp. (In re Pester Refining Co.)*, 964 F.2d 842, 849 (8th Cir.1992) (Section 1961 applies to judgments of bankruptcy courts).

### VI. CONCLUSION

Based upon the findings of fact and conclusions of law, the Trustees have prevailed in great part and the court will enter a judgment in conformity with this opinion. The Defendants' counterclaims were either dismissed before trial, or not proved at trial, and shall be dismissed.